| | |
|---|---|
| ROCKHURST UNIVERSITY, and MARYVILLE UNIVERSITY, individually and on behalf of other similarly situated institutions of higher education, | Case No. |
| Plaintiffs, | COMPLAINT |
| | Class Action |
| v. | DEMAND FOR JURY TRIAL |
| FACTORY MUTUAL INSURANCE COMPANY, | |
| Defendant. | |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Rockhurst University and Maryville University ("Plaintiffs"), individually and on behalf of other similarly situated institutions of higher education, for its Class Action Complaint against Defendant Factory Mutual Insurance Company ("Defendant"), state and allege as follows:

**NATURE OF ACTION**

1.       Institutions of higher education have been hit particularly hard by the ongoing COVID-19 pandemic. Since the disease began to spread rapidly across the country in late February and early March 2020, almost every college and university has taken drastic and unprecedented action to protect its students, faculty, staff, and the general public from COVID-19. This was no easy task. Most institutions of higher education are more like small- or medium-sized cities than mere schools. In addition to educating the future of America, they provide housing for hundreds or thousands of students; serve and sell food; operate stores; employ large numbers of teachers, administrators, and other employees; sponsor sports teams; host public events; and perform many other services.

2.      On March 6, 2020, the University of Washington became the first major university to cancel in-person classes and exams.[1] By the middle of March, others across the country had followed suit and more than 1,100 colleges and universities in all 50 state have canceled in-person classes and shifted to online-only instruction. Due directly to the pandemic, these institutions also: closed dorms and sent students home; shuttered all dining halls; closed administrative buildings; canceled spring sports seasons; canceled graduation ceremonies; closed campus entirely to all but a few essential personnel; and took many other precautions.

3.      Although the spring semester has now concluded for virtually all institutions, the effects of the pandemic continue to deprive Plaintiffs of the use of their campuses and property. Large gatherings are still prohibited. Residence halls are still closed. Summer classes are being held online. Events that would normally take place on campus during the summer – like summer camps – have been canceled in their entirety. And it is still unclear whether students will be permitted to return to campus for the fall semester, which looms just around the corner.

4.      Apart from the nightmarish logistical challenge, and the serious disruption to their core mission of education, the measures colleges and universities have taken as a result of COVID-19 have had a devastating financial impact. After closing dorms and dining halls, colleges and universities provided room-and-board reimbursements, often totaling in the millions of dollars. Other substantial costs include lost revenue from on-campus events; lost revenue from summer classes and programs; increased costs to clean and disinfect the campus as a result of COVID-19; and many others. And these losses may continue or worsen if these precautions continue into the fall semester.

---

[1] https://www.ncsl.org/research/education/higher-education-responses-to-coronavirus-covid-19.aspx

5.      Plaintiffs Rockhurst University and Maryville University are two such institutions that have suffered substantial financial losses due to COVID-19.

6.      Fortunately – or so they thought – Plaintiffs had purchased all-risk commercial property insurance policies from Defendant to protect them in the event of an event such as COVID-19. The Policies provide hundreds of millions of dollars in coverage for a wide variety of losses, including loss of use of property, business interruption, and property damage. The Policies contain specific provisions covering communicable diseases.

7.      Plaintiffs promptly made a claim for coverage under the Policy. But Defendant has refused to honor its promise to provide the protection that Plaintiffs purchased. Defendants have not paid any funds to date. Rather, it has indicated that any coverage – if provided – will be limited to the communicable disease provisions in Plaintiffs' Policies which have a sublimit far lower than Plaintiffs' expected losses and the overall limits of liability in each Policy. Defendant has further stated that even if the communicable disease coverages apply, they will cover damages far narrower than what the Policies' language provides.

8.      Plaintiffs are not unique. The insurance industry – and this Defendant in particular – appears to be taking a uniform approach to the current pandemic:  deny coverage even when the policy they drafted and offered to insureds, and the policy paid for by the insureds, does not contain an exclusion for pandemic- or virus-related losses. Based on other lawsuits and other publicly available information, it appears that Defendant is taking a consistent position with other insureds – including other higher education institutions – across the country. Indeed, in March 2020, Defendant began meeting with representatives of colleges and universities and actively discouraged those representatives from submitting claims for coverage.

3

9. Defendant's conduct is particularly galling in light of the huge amount of premiums insurers like Defendant receive annually. According to information published by the Insurance Information Institute, the U.S. insurance industry collected net premiums of $1.22 trillion in 2018. Premiums recorded by property/casualty insurers accounted for 51% of that amount. Between 2014 and 2018, these insurers wrote net premiums each year of between $497 billion to $612.6 billion but only incurred losses of between $277.7 billion and $360.9 billion.

10. This is a class action for declaratory judgment and breach of contract arising from Defendant's refusal to pay claims related to COVID-19 as required by its property insurance agreements it sold to Plaintiffs and other institutions of higher education.

## PARTIES

11. Plaintiff Rockhurst University is a Missouri nonprofit corporation, with its principal place of business in Kansas City, Missouri.

12. Plaintiff Rockhurst University is a private Jesuit university in Kansas City, Missouri. Founded in 1901, it now serves over 3,000 students. Its 55-acre campus is located just blocks from Kansas City's busy Country Club Plaza district and minutes from downtown.

13. As a result of, and in connection with the COVID-19 pandemic and related governmental restrictions on non-essential business, Rockhurst ceased normal operations and effectively closed its campus the week of March 16, 2020. Students did not return to campus from the Rockhurst's scheduled Spring Break recess. Rockhurst has refunded to students approximately $2.2 million in room, board, and fees, and has suffered, and will continue to suffer other substantial losses and damages. Campus facilities remain closed.

14. Plaintiff Maryville University is a Missouri nonprofit corporation, with its principal place of business in St. Louis, Missouri.

4

15.     Plaintiff Maryville University is a private university located in St. Louis, Missouri. It was founded in 1872 and serves over 10,000 students.

16.     Friday, March 6, 2020 was Maryville's last day of normal campus operations in advance of Spring Break. On March 10, 2020, Maryville announced that beginning on March 16, 2020, the first day classes were to resume after Spring Break, Maryville would be delivering all on-campus class virtually. On March 17-19, 2020, it conducted a move out for residential students and shuttered all dorms. In early April 2020, Maryville issued refunds in excess of $2 million to students for room and board. Campus facilities remain closed.

17.     Both Rockhurst and Maryville have had the confirmed presence of COVID-19 on property covered by the Policies.

18.     It is more likely than not that by at least early March 2020 other persons infected with COVID-19 were present on Plaintiffs' campuses and thereby caused the virus to be present throughout Plaintiffs' insured property and surrounding areas.

19.     As a result, Plaintiffs' insured property was rendered unsuitable for its intended use and was subject to a variety of limitations, restrictions, and prohibits, including by orders of applicable government entities ("Stay at Home Orders"), which are matters of public record.

20.     Defendant Factory Mutual Insurance Company, is a Rhode Island corporation, with its principal place of business in Johnston, Rhode Island.

## JURISDICTION AND VENUE

21.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed class contains more than 100 members.

5

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Plaintiffs' causes of action occurred in this judicial district and division. The Policies at issue covers Plaintiffs' facilities located in the State of Missouri, and Plaintiffs purchased the Policies from an insurance broker located in the State of Missouri.

## FACTUAL BACKGROUND

23.     The novel coronavirus – named "severe acute respiratory syndrome coronavirus 2" or "SARS-CoV2" – has spread widely and rapidly across the United States. The illness related to SARS-CoV-2 is "novel coronavirus disease 2019," commonly abbreviated to "COVID-19." Although the virus and related illness are distinct, for purposes of this Complaint, Plaintiffs refer to both interchangeably as "COVID-19."

24.     Over 1,100 Missourians and over 140,000 Americans have died of COVID-19 and there have been over 37,000 confirmed COVID-19 cases in Missouri and over 3.8 million confirmed cases in the United States, as of the date of this filing, according to the Coronavirus Resource Center at Johns Hopkins University. *See also* Centers for Disease Control and Prevention ("CDC") data.

25.     Both Plaintiffs' insured property has been rendered unsuitable for their intended uses and has been subject to a variety of limitations, restrictions, and prohibitions, including by government Stay at Home Orders imposed by the State of Missouri, Counties of Jackson, St. Louis, and St. Charles, City of Kansas City, and City of St. Louis.

26.     Plaintiffs also imposed limitations, restrictions, and prohibitions due to the dangerous condition caused by the presence of COVID-19.

27.     Orders restricting Plaintiffs' operations are still in effect in Kansas City, St. Louis, and Jackson, St. Louis, and St. Charles Counties as of the date of this filing.

6

28.     A growing body of evidence suggests that the virus transmits both through droplets, when someone sneezes and coughs, and aerosols, which are produced by normal breathing.

29.     Aerosols are particularly concerning because unlike droplets, which stay airborne for only a few seconds, aerosols are water droplets suspended in air and can remain suspended for hours, until gravity ultimately forces them to the nearest surface below.

30.     Consequently, aerosols can spread widely through air flow and settle on surfaces hundreds of feet away from any infected individual. Thus, someone not even in the vicinity of an infected person can unknowingly touch an infected surface, later touch their face, and become infected.

31.     As a result, at least 42 states and countless local governments issued substantially similar "stay at home" orders, the purpose of which was to mitigate and slow the spread of COVID-19.

32.     According to the CDC, everyone is at risk of getting COVID-19. The virus can spread by respiratory droplets when an infected person coughs, sneezes, or talks. A person can become infected from respiratory droplets or potentially by touching a surface or object that has the virus on it and then by touching the mouth, nose, or eyes.[2]

33.     According to studies, the virus can live on surfaces for several days if not longer.[3] The New England Journal of Medicine reported finding that experimentally-produced aerosols containing the virus remained infectious in tissue-culture assays, with only a slight reduction in

---

[2]     https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[3]     https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf

infectivity during a 3-hour period of observations. "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces…."[4]

34. The study also found that COVID-19 was detectable for up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel.[5]

35. All of these materials are used by Plaintiffs throughout their facilities and operations.

36. The study's results indicate that individuals can become infected with COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.

37. A consensus appears to be emerging that COVID-19 can travel through the air via aerosols. For example, aerosol scientist Lidia Morawska of the Queensland University of Technology in Brisbane, Australia told *Nature* that, "In the minds of scientists working on this, there's absolutely no doubt that the virus spreads in the air. This is a no-brainer."[6]

38. An April 2020 study published in the journal *Emerging Infectious Diseases* found a wide distribution of COVID-19 on surfaces and in the air about *13 feet* from patients in two hospital wards in Wuhan, China, leading the authors to conclude that the virus spreads in aerosols in addition to large respiratory droplets. The investigators found evidence of the virus in swabs of floors, computer mice, trash bins, bed handrails, patients' face makes, health workers' personal protective equipment, and air vents.[7]

---

[4]     https://www.nejm.org/doi/full/10.1056/NEJMc2009324

[5]     https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces

[6]     https://www.nature.com/articles/d41586-020-00974-w

[7]     https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

8

39.     The authors also surmised that the high rate of positivity for floor samples in the hospital strongly suggest that droplets fall to the ground and then are spread via patients' shoes. For example, every sample tested from the pharmacy floor tested positive for COVID-19 even though no patients were housed there.[8]

40.     Another study conducted in Wuhan indicates that staff movement, floor cleaning, and the removal of personal protective equipment could transmit the virus through the re-suspension of virus-contaminated aerosols.[9]

41.     Kimberly Prather, an aerosol chemist at the University of California, San Diego told *Science* magazine: "I'm relieved to see aerosolization is accepted. This added airborne pathway helps explain why it is spreading so fast."[10]

42.     Aerosol particles are held in the air by physical and chemical forces. The suspended particles remain for *hours or more*, depending on factors such as heat and humidity. If virus particles can be suspended in air for more than a few seconds, like, for instance, the measles virus can, then anyone passing through could become infected by a pathogenic aerosol cloud. And the virus can travel long distances and land on surfaces, only to be stirred back up into the air later by cleaning or other disturbances.

43.     The SARS virus that caused a 2003 epidemic is a coronavirus and is similar to COVID-19. As a result, the behavior of SARS during the 2003 epidemic provided evidence about any aerosol risk from COVID-19.

---

[8]     https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

[9]     https://www.biorxiv.org/content/10.1101/2020.03.08.982637v1

[10]     https://www.sciencemag.org/news/2020/04/you-may-be-able-spread-coronavirus-just-breathing-new-report-finds#

44.     A 2014 analysis published in the journal *Clinical Infectious Diseases* investigated a seemingly puzzling outbreak in a Hong Kong apartment complex whose residents had not been in close contact with each other.[11] The study found that "airborne spread was the most likely explanation, and the SARS coronavirus could have spread over a distance of 200 meters," or about 600 feet.[12]

45.     The implications of airborne spread of the virus are extremely serious. Airborne spread means that the virus can travel long distances from any infected person. It can then infect someone who unknowingly walks through a pathogenic cloud. It can also infect someone by settling on a physical surface, which someone touches and later becomes infected. And regardless of the transmission method, the evidence suggests that COVID-19 can be transmitted by shoes even once it reaches the ground.

46.     State and local governments have determined that without the Stay at Home Orders, COVID-19 could spread rampant throughout the community.

47.     The Stay at Home Orders in and around Plaintiffs' property also explicitly acknowledge that COVID-19 causes direct physical damage and loss to property:

    a.  the City of Kansas City, Missouri, issued Order 20-01 in response to the pandemic, which states that "the City wishes to employ all means available under the law to protect public life, health, safety and **property** to limit the development, contraction and spread of COVID-19"[13] (emphasis added);

---

[11]     https://academic.oup.com/cid/article/58/5/683/365793

[12]     *Id.*

[13]     http://mediaassets.kshb.com/NWT/Sam/Mayor%20Lucas%20Stay%20at%20Home%20Order.pdf?_ga=2.87564241.83785035.1587504680-1549958454.1581544124

b.  the Order from Johnson County, Kansas states that COVID-19 "endanger[s] health, safety and welfare of persons and **property** within the border of Johnson County, Kansas" and that it "remains a public disaster affecting life, healthy, **property**, and the public space.[14] (emphasis added).

### *The Factory Mutual Policies*

48.  To protect themselves against risks like COVID-19, Plaintiffs purchased insurance policies (the "Policies") from Defendant. The Policies were in effect at the time of the outbreak and remains in effect today. Plaintiffs paid all premiums required by the Policies.

49.  Plaintiffs are Named Insureds under their respective Policies.

50.  Defendant is the effective and liable insurer of the Policies and policies meeting the class definition.

51.  Generally, under property insurance policies like those issued by Defendant to Plaintiffs and class members, the insuring agreements provide coverage for all risks of physical loss or damage to property, unless specifically excluded.

52.  The Policies are "all-risk" policies. They cover "all risks of physical loss or damage." Rockhurst Policy, attached hereto as Ex. A at 8.[15] Rockhurst's Policy provides coverage up to a limit of $278,126,000. Ex. A at 11. Maryville's Policy provides coverage up to a limit of $314,116,000. Ex. B at 9. Unless damage is clearly excluded or included within a listed sublimit, the full limit of liability is available for Plaintiffs' damages.

---

[14]  https://www.jocogov.org/sites/default/files/documents/CMO/JoCo%20Public%20 Health%20Officer%20Stay%20at%20Home%20Order%203-22-20.pdf

[15]  Maryville's Policy is attached to this Complaint as Ex. B. The two Policies are materially identical. Except as specifically noted, Plaintiffs cite to Rockhurst's Policy (Ex. A) as the representative Policy for purposes of this Complaint.

11

53.     The Policies specifically include coverage for communicable disease. They define "communicable disease" as "disease which is…transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges…." Ex. A at 83. Defendant has acknowledged that COVID-19 is a "communicable disease" under the Policies.

54.     The Policies' "**Communicable Disease Response**" coverage applies when an insured location "has the actual not suspected presence of communicable disease and access to such location is limited, restricted or prohibited by: (1) an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or (2) a decision of an Officer of the Insured as a result of the actual not suspected presence of communicable disease…." Ex. A at 30-31. Under this coverage, Defendant agrees to cover "the reasonable and necessary costs incurred by the Insured…for the: (1) cleanup, removal and disposal of the actual not suspected presence of communicable diseases from insured property; and (2) actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presences of communicable diseases on insured property."

55.     As a result of the actual not suspected presence of COVID-19, Officers of Plaintiffs limited, restricted or prohibited access to their property, which caused Plaintiffs to incur losses covered by the Communicable Disease Response provision in the Policies. In addition, the applicable Stay at Home orders limited, restricted or prohibited access to Plaintiffs' property, which caused Plaintiffs to incur losses covered by the Communicable Disease Response provision in the Policies.

56.     The Policies' "**Interruption by Communicable Disease**" coverage applies when an insured location "has the actual not suspected presence of communicable disease and access to

12

such location is limited, restricted or prohibited by: (1) an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or (2) a decision of an Officer of the Insured as a result of the actual not suspected presence of communicable disease….” Ex. A at 69. Under this coverage, Defendant agrees to cover the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such location with the actual not suspected presence of communicable disease.” *Id*.

57.     As a result of the actual not suspected presence of COVID-19, Officers of Plaintiffs limited, restricted or prohibited access to their property, which caused Plaintiffs to incur losses covered by the Interruption by Communicable Disease provision in the Policies. In addition, the applicable Stay at Home orders limited, restricted or prohibited access to Plaintiffs' property, which caused Plaintiffs to incur losses covered by the Interruption by Communicable Disease provision in the Policies.

58.     The Policies also provide coverage for **“Decontamination Costs,”** which covers “the increased cost of decontamination and/or removal of…contaminated insured property” if “insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating contamination due to the actual not suspected presence of contaminants.” Ex. A at 32. Plaintiffs have incurred Decontamination Costs due to COVID-19.

59.     The Policies also contain a **“Time Element”** section that provides coverage for lost earnings or lost profits “directly resulting from physical loss or damage of the type insured.” Ex. A at 47.  Plaintiffs have suffered Time Element losses due to COVID-19.

60.     The Time Element section also covers **"Extra Expense."** Ex. A at 53. Extra Expenses are "expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business." *Id.* Plaintiffs have incurred Extra Expenses due to COVID-19.

61.     The Policies provide coverage from an interruption to business caused by an order from a **"Civil or Military Authority."** Exhibit A at 62. Specifically, the Policies cover "the Actual Loss Sustained and EXTRA EXPENSE incurred by the insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five statute miles/eight kilometres of it." *Id.* Access to Plaintiffs' property has been limited, restricted, and prohibited in part or in total due to the presence and threat of COVID-19 and related Stay-at-Home Orders.

62.     The Policies provide "**Ingress and Egress**" coverage, which requires Defendant to pay for "the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured…due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured location" provided that "such prevention is a direct result of physical damage of the type insured to property of the type insured." Ex. A at 63-64. Ingress to and egress from Plaintiffs' property has been partially or totally prevented due to COVID-19.

63.     The Policies also provide additional coverages that apply to Plaintiffs' claim, including, but not limited to **"Contingent Time Element Extended"**; **"Expediting Costs"**; **"Protection and Preservation of Property"**; **"Claims Preparation Costs"**; and **"Tuition Fees"** coverage. *See* Ex. A.

### *Plaintiffs' Claims to Factory Mutual*

64.     Plaintiffs each submitted timely claims to Defendant for coverage under the Policy.

65.     Since submitting their claims, Defendant has submitted questions to Plaintiffs regarding their claim and communicated Defendant's view of the coverage available under the Policies.

66.     Defendant has indicated that the only bases for coverage under the Policies are Communicable Disease Response and Interruption by Communicable Disease. Communicable Disease Response and Interruption by Communicable Disease share a $1,000,000 sublimit, far less than Plaintiffs' total losses from COVID-19 and the overall limits of liability under the Policies. Ex. A at 12. Defendant's position is contrary to the language of the Policies.

67.     With respect to the communicable disease coverages, Defendant also has indicated that for coverage to apply, Plaintiffs must establish the actual presence of COVID-19 on campus by showing a positive COVID-19 test result for someone who was on campus. Defendant also has indicated that for coverage to apply the confirmed COVID-19 test from someone on campus must be the reason an officer of Plaintiffs or a governmental authority restricted access to the campus. Defendant's position is contrary to the language of the Policies.

68.     Thus, Defendant has made clear that it will not provide the full extent of coverage under the Policies for losses due to COVID-19.

## CLASS ACTION ALLEGATIONS

69.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4), Plaintiffs bring this action on behalf of themselves and all others similarly situated, and seeks to represent the following nationwide classes:

      a.    **Nationwide Declaratory Judgment Class.** All institutions of higher education that are covered by one of the Defendant's policies in effect during the COVID-19 pandemic.

15

b. **Nationwide Breach Class.** All institutions of higher education that are covered by one of the Defendant's policies in effect during the COVID-19 pandemic.

c. **Missouri Subclass.** All institutions of higher education that purchased one of Defendant's Policies in Missouri and are covered by one of the Defendant's policies in effect to COVID-19.

70. Plaintiffs' Classes satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23, as set forth more fully herein.

71. **Numerosity**. COVID-19 has impacted thousands of higher education institutions across the country and Defendant is a nationwide insurer with, on information and belief, hundreds or more policies issued with the relevant provisions. Consequently, the Classes each number in at least the hundreds and most likely thousands, and thus the numerosity standard is satisfied. Moreover, because the members of the Classes are geographically dispersed across the country, and members of the Missouri Subclass are geographically dispersed across the state, if not elsewhere, joinder of all Class members in a single action is impracticable. Class members and Missouri Subclass members may be informed of the pendency of this class action through direct mail or other means based on Defendant's records of its policyholders.

72. **Commonality.** There are questions of fact and law common to the Classes that predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from Defendant's actions include, without limitation, the following:

a. Do the Policies cover losses resulting from the COVID-19 pandemic?

b. Do the Policies cover losses resulting from state and local Stay At Home Orders requiring the suspension or reduction in business?

c. Has Defendant wrongfully denied claims for business losses resulting from COVID-19 and/or the Stay at Home Orders?

16

d. Do any of the following provisions in the Policies cover losses due to COVID-19: (i) physical loss or damage to property; (ii) time element; (iii) contingent time element extended; (iv) civil or military authority; (v) ingress/egress; (vi) extra expense; (vii) communicable disease response; (viii) interruption by communicable disease; (ix) decontamination costs; (x) expediting costs; (xi) preservation of property; (xii) claims preparation costs; and/or (xiii) tuition fees?

e. Has Defendant breached its Policies by refusing to cover COVID-19 related losses?

f. Are Class members entitled to reasonable attorneys' fees and expenses?

73. **Predominance.** The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein. Specifically, thousands of institutions of higher education are impacted by Defendant's denial of coverage for COVID-19 losses and their claims arise from a common factual predicate, which is the nationwide shutdown and suspension of activities due to the virus.

74. **Typicality.** Plaintiffs' claims are typical of those of the Classes as Plaintiffs were subject to the same or similar policy provisions and the losses for all members relate to COVID-19 and the related closure orders and the claims arise from the same legal theories.

75. **Superiority.** A class action is the appropriate method for the fair and efficient adjudication of this controversy. Defendant has acted or refused to act on grounds generally applicable to the Class and Missouri Subclass. The presentation of separate actions by individual Class members and Missouri Subclass members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Class members to protect their interests.

76. **Adequacy**. Plaintiffs are adequate representatives of the Class and Missouri Subclass because they are a member of the Class and its interests do not conflict with the interests of those it seeks to represent. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel, who have extensive experience prosecuting complex class litigation.

77. **Declaratory Relief and certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure**. On information and belief, Defendant has refused, or intends to refuse, coverage due to COVID-19 business interruption and other covered losses for all, or most, policyholders with covered Policies and final injunctive and/or declaratory relief mandating that Defendant cover the losses of Class members is appropriate respecting the class as a whole.

78. **Issue Class and Modification of Class Definitions and Creation of Subclasses**. In the alternative, Plaintiffs reserve the right to seek certification of one or more common issues pursuant to Rule 23(c)(4). In addition, Plaintiffs reserve the right to modify the definitions of the class and/or create subclasses either by amendment to the complaint or by motion for class certification, including but not limited to subclasses for policyholders under specific Policy provisions.

## COUNT I: DECLARATORY RELIEF
### (On behalf of Nationwide Declaratory Judgment Class and Missouri Subclass)

79. The preceding paragraphs are incorporated by reference as if fully alleged herein.

80. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

81. An actual controversy has arisen and now exists between Plaintiffs and the class, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the parties under the Policies. In June 2020, Plaintiffs each requested coverage for COVID-19

18

related losses. Over the course of various communications, Defendant stated that it would consider Plaintiffs' claim under the communicable disease coverage of Plaintiffs' policy *only* and that it would provide coverage under those provisions only under improperly narrow circumstances. Defendant is in breach of its obligations by refusing to provide coverage under other provisions of the Policies and for improperly construing the communicable disease coverage. Moreover, upon information and belief, Defendant has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy.

82. Plaintiffs contend that Defendant has breached the Policies in the following respects:

     a. Plaintiffs and the class have suffered losses due to COVID-19 covered by the Policies.

     b. Defendant is obligated to pay Plaintiffs and the class for those losses.

     c. Defendant has failed to pay Plaintiffs and the class for those losses.

83. Plaintiffs therefore seek a declaration of the parties' respective rights and duties under the Policies and requests the Court declare the aforementioned conduct of Defendant unlawful and in material breach of the policies so that future controversies may be avoided.

### COUNT II: BREACH OF CONTRACT AND/OR ANTICIPATORY BREACH
**(On behalf of Nationwide Breach Class and Missouri Subclass)**

84. The preceding paragraphs are incorporated by reference as if fully alleged herein.

85. Plaintiffs and the class purchased property coverage policies from Defendant.

86. The Policies are valid and enforceable contracts between the Defendant and Plaintiffs and class members.

87.     Plaintiffs and the class substantially performed their obligations under the terms of the Policies including giving Defendant notice of the claim. Alternatively, Defendant has waived any terms or conditions of coverage and may not assert any term or condition in the Policy as a defense to liability.

88.     Plaintiffs and the class have sustained a loss covered by the Policies arising from the COVID-19 virus and associated state and local Stay at Home orders.

89.     Defendant has stated that it would consider Plaintiffs' claim under the communicable disease coverage of Plaintiffs' policy *only* and that it would provide coverage under those provisions only under improperly narrow circumstances. Defendant is in breach of its obligations by refusing to provide coverage under other provisions of the Policies and for improperly construing the communicable disease coverage. Moreover, upon information and belief, Defendant has refused or will refuse other, similar claims claiming that COVID-19 losses are not covered by the Policy. Defendant therefore unjustifiably refuses to pay for losses covered by the Policies, in breach of the Policies.

90.     Defendant has refused to pay claims related to COVID-19 on a uniform and class-wide basis, in breach of the policies.

91.     Any conditions precedent to a claim for breach of contract under the Policies have occurred, been satisfied, or, in any event, should be excused or otherwise discarded on the basis of futility or other applicable law.

92.     As a direct and proximate result of Defendant's breaches, Plaintiffs and the class have sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request relief and judgment against Defendant as follows:

a.    That the Court enter an order certifying the class, appointing Plaintiffs as representatives of the class, appointing Plaintiffs' counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

b.    For a judgment against Defendant for the causes of action alleged against it;

c.    For compensatory damages in an amount to be proven at trial;

d.    For a declaration that Defendant's conduct as alleged herein is unlawful and in material breach of the Policy;

e.    For pre-judgment and post-judgment interest at the maximum rate permitted by law;

f.    For Plaintiffs' attorney's fees;

g.    For Plaintiffs' costs incurred; and

h.    For such other relief in law or equity as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Date: July 23, 2020                    Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

*s/ Patrick J. Stueve*
Patrick J. Stueve, MO Bar # 13847
Todd M. McGuire, MO Bar # 51361
Bradley T. Wilders, MO Bar # 78301
Curtis Shank, MO Bar # 66221
Abby E. McClellan, MO Bar # 66069
460 Nichols Road, Suite 200

21

Kansas City, Missouri 64112
Telephone:     816-714-7100
Facsimile:     816-714-7101
Email:          stueve@stuevesiegel.com
Email:          mcguire@stuevesiegel.com
Email:          wilders@stuevesiegel.com
Email:          shank@stuevesiegel.com
Email:          mcclellan@stuevesiegel.com

**MILLER SCHIRGER LLC**

John J. Schirger, MO # 60583
Matthew W. Lytle, MO #59145
Joseph M. Feierabend, MO #62563
4520 Main Street, Suite 1570
Kansas City, MO 64111
Telephone:     (816) 561-6500
Facsimile:     (816) 561-6501
Email:          jschirger@millerschirger.com
Email:          mlytle@millerschirger.com
Email:          jfeierabend@millerschirger.com

**LANGDON & EMISON LLC**

J. Kent Emison, MO #29721
911 Main Street
PO Box 220
Lexington, Missouri 64067
Telephone:     (660) 259-6175
Facsimile:     (660) 259-4571
Email:          kent@lelaw.com

**SHAFFER LOMBARDO SHURIN, P.C.**

Richard F. Lombardo, MO# 29748
2001 Wyandotte Street
Kansas City, MO 64108
Telephone:     816-931-0500
Facsimile:     816-931-5775
Email:          rlombardo@sls-law.com

*Attorneys for Plaintiffs and the Proposed Classes*