**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| ROCKHURST UNIVERSITY, and MARYVILLE UNIVERSITY, individually and on behalf of other similarly situated institutions of higher education, | Case No. 4:20-CV-00581-BCW |
| Plaintiffs, | FIRST AMENDED COMPLAINT |
| | Class Action |
| v. | DEMAND FOR JURY TRIAL |
| FACTORY MUTUAL INSURANCE COMPANY, | |
| Defendant. | |

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Rockhurst University and Maryville University, individually and on behalf of other similarly situated institutions of higher education, hereby files their First Amended Class Action Complaint against Defendant Factory Mutual Insurance Company ("FM Global"), and states and alleges as follows:

## SUMMARY OF ACTION

1.     This action arises out of a coverage dispute between FM Global and Plaintiffs over Plaintiffs' ongoing physical loss or damage to covered property and resultant economic losses attributable to the Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2 or the Coronavirus), the Coronavirus Disease 2019 (COVID-19) and the ongoing pandemic under the "ALL RISKS" commercial property insurance policy FM Global sold to Plaintiffs for the policy period July 1, 2019 to July 1, 2020 (the "Policy"). The Policy is written on the standard FM Global Advantage policy form. Under the Policy, FM Global agreed to a "maximum limit of liability in an occurrence, including any insured TIME ELEMENT loss" of "USD 278,126,000" (Rockhurst)

and "USD 314,116,000" (Maryville). The Policy broadly covers Plaintiffs' campuses and other described property against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as . . . excluded." By its terms, the Policy expressly identifies "communicable disease" as an insured risk of physical loss or damage, and no exclusion applies to Plaintiffs' claims. Despite this, FM Global has failed and refused to acknowledge coverage on Plaintiffs' claims for losses and damage attributable to the Coronavirus, COVID-19 and the ongoing pandemic.

2.      As of March 11, 2020, the extent of COVID-19 infection caused by the Coronavirus was declared a pandemic by the World Health Organization. According to the Coronavirus Resource Center at John Hopkins University (available at: https://coronavirus.jhu.edu/ (last visited February 8, 2021)), there have been over 106 million global confirmed cases of COVID-19 and over 2.3 million global deaths. In the United States, there have been over 27 million confirmed cases of COVID-19 and over 460,000 deaths. These numbers continue to rise daily.

3.      Institutions of higher education have been hit particularly hard by the presence of the Coronavirus, COVID-19 and the ongoing pandemic. By March 2020, colleges and universities had taken drastic and unprecedented action to protect their students, faculty, staff, and the general public from the Coronavirus and COVID-19. This was no easy task. Most institutions of higher education are more like small- or medium-sized cities than mere schools. In addition to educating the future of America, they provide housing for hundreds or thousands of students; serve and sell food; operate stores; employ large numbers of teachers, administrators, and other employees; sponsor sports teams; host public events; and perform many other services.

4.      On March 6, 2020, the University of Washington became the first major university to cancel in-person classes and exams.[1] By the middle of March, other colleges and universities

---

[1] https://www.ncsl.org/research/education/higher-education-responses-to-coronavirus-covid-19.aspx

2

across the country had followed suit. The spring semester of 2020 was significantly disrupted by the presence of the Coronavirus, COVID-19 and the ongoing pandemic as more than 1,300 colleges and universities in all 50 states suspended normal campus operations, cancelled in-person classes and shifted to remote / virtual instruction.

5.      Plaintiffs are representative of the colleges and universities impacted by the presence of the Coronavirus, COVID-19 and the ongoing pandemic. Due directly to the presence of the Coronavirus, COVID-19 and the ongoing pandemic, in March 2020 Plaintiffs: closed dorms and sent students home; shuttered all dining halls; closed administrative buildings; canceled spring sports seasons; canceled graduation ceremonies; closed campus entirely to all but a few essential personnel; and took many other actions. Revenue-producing summer events also were canceled. Residence halls remained closed. Summer classes were held in a remote / virtual format. And events that would normally take place on campus during the summer – like summer camps – were canceled in their entirety.

6.      In the fall of 2020, Plaintiffs, like many institutions, reopened their campuses in a limited capacity and subject to extensive new policies, protocols and measures. But the effects of the Coronavirus, COVID-19 and ongoing pandemic continue to deprive Plaintiffs of the full use of their campuses and property. Large gatherings are still prohibited. Visitors are extremely limited. And Plaintiffs have taken unprecedented additional action and implemented extensive policies, protocols and measures to address the challenges associated with the presence of the Coronavirus / COVID-19 and the ongoing pandemic.

7.      Apart from the nightmarish logistical challenge, and the serious disruption to their core mission of education, the measures colleges and universities have taken due to the Coronavirus, COVID-19 and the ongoing pandemic have had a devastating financial impact. After

closing of dorms and dining halls, colleges and universities, including Plaintiffs, provided room-and-board reimbursements, often totaling in the millions of dollars, and suffered and continue to suffer significant losses in the form of, among other things, lost revenue and added expense attributable to the Coronavirus, COVID-19 and the ongoing pandemic.

8.      Common categories of lost revenue suffered by Plaintiffs and other similarly situated institutions of higher education attributable to the Coronavirus, COVID-19 and the ongoing pandemic include, among other things: (a) lost tuition income; (b) lost fundraising income; (c) lost income from residential population room, board and related fees; (d) lost income from extra or co-curricular activities (*e.g.*, athletic and other contests, student concerts); (e) lost income from college retail outlets (*e.g.*, bookstore, cafeteria, childcare services, parking); and (f) lost income from special events and rental (*e.g.*, conferences, camps, retreats, weddings, reunions, non-student concerts and similar events).

9.      Common categories of added expense incurred by Plaintiffs and other similarly situated institutions of higher education attributable to the Coronavirus, COVID-19 and ongoing pandemic include, among other things: (a) added technology expense associated with shift to virtual learning; (b) added technology expense associated with shift to work-from-home; (c) added public safety expenses in the form of 1) enhanced cleaning, sanitizing and disinfecting (paying special attention to common areas and high-touch surfaces / areas), 2) purchase of additional disinfecting supplies and hand sanitizer, 3) implement facial covering requirement, 4) implement physical distancing measures (including reducing facility capacities and making changes to classrooms, lobbies, study areas and meeting rooms, and modifying instructional methodology of courses), 5) alter work schedules and meeting protocols, 6) implement systems to assist with COVID-19 self-care, tracing and related disinfection and quarantining efforts, 7) educational

4

outreach related to COVID-19 measures, policies and protocols, and 8) COVID-19 testing, etc.; and (d) added public safety expenses in the form of facilities changes, including 1) placement of hand sanitizer and health-information posters, 2) installation of signage and plexiglass shields, 3) modified work area layouts and seating arrangements, 4) implement changes to allow for affected residential students to quarantine / isolate, and 5) restrict or otherwise modify use of recreational facilities, etc.

10.     Plaintiffs' losses and expenses include, among other things, a Spring 2020 room and board refund of more than $2 million each, plus additional losses and expenses (which are continuing) currently in excess of several million more – all attributable to the Coronavirus, COVID-19 and the ongoing pandemic.

11.     Fortunately – or so it thought – Plaintiffs purchased an "ALL RISKS" commercial property insurance policy from FM Global, which broadly "covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy."

12.     Among its many features, the "All Risks" coverage Plaintiffs purchased from FM Global includes specific coverage for property loss or damage and time-element (business interruption) losses caused by the actual on-site presence of "Communicable Diseases" such as COVID-19. The Policy's "All Risks" coverage, including its Property Damage and Time Element coverages, have been triggered as Plaintiffs have sustained physical loss or damage to covered property, and suffered time element (business interruption) losses directly resulting from physical loss or damage of the type insured by the Policy.

13.     Plaintiffs' "All Risks" Policy goes even further, providing coverage designed to address the principal economic consequences of pandemics:  lockdowns, facility closures, and

other interruptions triggered by the threat that off-site prevalence of the Coronavirus / COVID-19 will spread to unimpacted locations that could become disease vectors if permitted to operate "as usual" during the pandemic. Plaintiffs' Policy thus specifically addresses the principal economic harm arising from the highly unusual event of pandemic-caused interruptions to business, by providing coverage for losses resulting from the threat that off-site Coronavirus / COVID-19 will spread to Plaintiffs' covered locations.

14.     The Policy's coverage for threat-based interruptions to business (as opposed to interruptions resulting from the actual or suspected on-site presence of the Coronavirus / COVID-19) has also been triggered here, as Plaintiffs' insured locations experienced, for example access limitations, closures and the slowdown or cessation of their business activities instituted as a response to the threat that local outbreaks of COVID-19 (including within five miles of Plaintiffs' insured locations) could spread to Plaintiffs' campuses and those of third parties, which also triggered the issuance (and continued issuance) of various civil authority orders of national, state, county and city governments.

15.     The Policy provides many other broad protections against a wide range of pandemic-related losses, including direct loss and damage to property and associated time element loss, losses due to government-ordered shutdown, losses due to impaired ingress or egress from Plaintiffs' insured locations, extra expenses and costs to remain in business despite pandemic conditions, claims preparation costs, losses directly resulting from the presence of communicable disease at Plaintiffs' insured locations, and other forms of coverage.

16.     Under the Policy, FM Global agreed to a "maximum limit of liability in an occurrence, including any insured TIME ELEMENT loss" of "USD 278,126,000" (Rockhurst) and "USD 314,116,000" (Maryville).

17.    Plaintiffs submitted claims to FM Global for physical loss or damage to covered property and resulting business interruption and other covered losses and damage attributable to the presence of the Coronavirus, COVID-19 and the ongoing pandemic, asking for FM Global's confirmation as to coverage with respect to each and every potentially applicable basis for coverage under all provisions of the Policy. Plaintiffs identified an initial date of loss as on or around mid-March 2020, with losses and damage ongoing. To date, Plaintiffs' insured property remains impaired and not ready for operations under the same or equivalent physical and operating conditions that existed prior to the initial loss and damage.

18.    FM Global categorically refused to acknowledge any possibility of coverage on Plaintiffs' claims beyond (perhaps) the Policy's PROPERTY DAMAGE section coverage for COMMUNICABLE DISEASE RESPONSE and the Policy's TIME ELEMENT section coverage for INTERRUPTION BY COMMUNICABLE DISEASE (subject to a combined annual aggregate not to exceed USD 1,000,000). Upon information and belief, FM Global approached Plaintiffs' claims (and the claims of other similarly situated insureds) based on FM Global's pre-determined conclusion (as set forth, for example, in FM Global's internal memo, "Talking Points on the 2019 Novel Coronavirus (2019-nCoV)) that any claim for loss or damage attributable to the Coronavirus, COVID-19 and the ongoing pandemic does not constitute "insured physical loss or damage to property" and "is not of the type insured against as a virus falls within the definition of contamination, which is excluded."

19.    And even with respect to the Policy's communicable disease response and interruption coverages, FM Global took an overly restrictive and exceedingly narrow view of the Policy's vague, ambiguous and undefined trigger for those coverages in such a manner so as to evade coverage, contravene public policy, and frustrate the objectively reasonable expectations of

7

coverage under the circumstances. FM Global insisted that the communicable disease coverages could not be triggered unless Plaintiffs could provide documentation of a laboratory confirmed positive COVID-19 test result associated with a person that was infected with COVID-19 while on campus in March, 2020, and that such person's presence on campus while infected with COVID-19 was the basis for the requisite order or decision to limit, restrict or prohibit access to their campus.

20.    To date, FM Global has failed and refused to acknowledge coverage or pay anything on any aspect of Plaintiffs' claims for losses and damage attributable to the Coronavirus, COVID-19 and the ongoing pandemic.

21.    FM Global's position on coverage under the Policy is wrong as to Plaintiffs and all other similarly situated institutions of higher education. Contrary to FM Global's position, the Policy provides coverage for Plaintiffs' claims for losses and damage attributable to the Coronavirus, COVID-19 and ongoing pandemic, and the Policy has no enforceable exclusion applicable to Plaintiffs' claims.

22.    FM Global's refusal to acknowledge coverage on Plaintiffs' claims is not unique. Based on other lawsuits and other publicly available information, it appears that FM Global is taking a consistent position with other insureds – including other similarly situated higher education institutions – across the country.

23.    FM Global's conduct is particularly galling in light of the huge amount of premiums insurers like FM Global receive annually. According to information published by the Insurance Information Institute, the U.S. insurance industry collected net premiums of $1.22 trillion in 2018. Premiums recorded by property/casualty insurers accounted for 51% of that amount. Between

2014 and 2018, these insurers wrote net premiums each year of between $497 billion to $612.6 billion but only incurred losses of between $277.7 billion and $360.9 billion.

24.     This is a class action for declaratory judgment and breach of contract. Plaintiffs, individually and on behalf of a class of similarly situated institutions of higher education, seek a declaration as to the scope and breadth of the parties' rights and obligations under the Policy in connection with Plaintiffs' claims for losses and damage attributable to the Coronavirus, COVID-19 and the ongoing pandemic, and FM Global's failure and refusal to acknowledge coverage. Should the Court determine that FM Global's coverage position is wrong, Plaintiffs, individually and on behalf of a class of similarly situated institutions of higher education, seek damages for FM Global's breach of contract for its failure to honor its obligations under the Policy.

## PARTIES

25.     Plaintiff Rockhurst University is a Missouri nonprofit corporation, with its principal place of business in Kansas City, Missouri.

26.     Rockhurst University is a private Jesuit university in Kansas City, Missouri. Founded in 1901, it now serves nearly 4,000 students. Its 55-acre campus is located just blocks from Kansas City's busy Country Club Plaza district and minutes from downtown.

27.     Plaintiff Maryville University is a Missouri nonprofit corporation, with its principal place of business in St. Louis, Missouri.

28.     Plaintiff Maryville University is a private university located in St. Louis, Missouri. It was founded in 1872 and serves over 10,000 students.

29.     Plaintiffs are members of the College and University Risk Management Association (CURMA). Upon information and belief, all CURMA members purchased and are covered by the same standard FM Global Advantage policy form as Plaintiffs. Upon information

9

and belief, numerous other institutions of higher education are similarly insured under the same standard FM Global Advantage policy form as Plaintiffs. Similarly situated institutions of higher education insured by FM Global under FM Global's Advantage policy form (or such other form that is the same or substantially similar) can be identified by FM Global based on the books, records and other data / information it maintains in the ordinary course of business.

30.    Defendant Factory Mutual Insurance Company ("FM Global") is a Rhode Island corporation, with its principal place of business in Johnston, Rhode Island.

## JURISDICTION AND VENUE

31.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. 1332(a) because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed classes contain more than 100 members.

32.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Plaintiffs' causes of action occurred in this judicial district and division. The Policy at issue covers, among other things, Rockhurst University's main campus and property located in Kansas City, Missouri.

## FACTUAL BACKGROUND

33.    As a result of the Coronavirus, COVID-19 and the ongoing pandemic, including the presence of the Coronavirus and the COVID-19 disease on Plaintiffs' insured property and in surrounding areas (including on property within 5 statute miles of Plaintiffs' insured property), and orders issued by national, state and local governments in response thereto (including orders

10

that limit, restrict or prohibit partial or total access to Plaintiffs' insured property), Plaintiffs ceased normal operations and effectively closed their campuses in mid-March 2020 and have not yet been able to resume normal operations and use of their insured property in the same manner as they had prior to the initial loss and damage.

34.     Friday, March 6, 2020 was Rockhurst's last day of normal campus operations in advance of Spring Break. On March 12, 2020, Rockhurst announced that face-to-face classes would be suspended for a minimum of two weeks, through at least March 28, 2020, and that all university events with more than 50 attendees were cancelled through March 31, 2020. On March 16, 2020, Rockhurst announced that it was closing student residences for the remainder of the semester, subject to a staggered schedule for move-out over the following days. On March 21, 2020, Kansas City and surrounding areas declared a stay-at-home order that began at 12:01 a.m. on March 24, 2020. Accordingly, beginning March 24, 2020, Rockhurst's campus was closed to everyone except essential personnel. In early May, 2020, Rockhurst announced that its campus would continue to be closed to everyone except essential personnel until the end of May at the earliest. In the fall of 2020, Rockhurst reopened its campus in a limited capacity and subject to a variety of Coronavirus / COVID-19-related restrictions, limitations and modifications. To date, Rockhurst's insured property remains impaired and not ready for operations under the same or equivalent physical and operating conditions that existed prior to the initial loss and damage.

35.     Friday, March 6, 2020 was Maryville's last day of normal campus operations in advance of Spring Break.  On March 10, 2020, Maryville announced that beginning the Monday after spring break (March 16, 2020), the university would be delivering on-campus classes in a virtual learning format for the following two weeks.  At that time, Maryville planned to resume on-campus classes on March 30. Maryville explained that it had taken and would continue to take

11

steps to clean and disinfect campus as recommended by the CDC. On March 13, 2020, Maryville recommended to commuter students that they avoid coming to campus for the next two weeks. Maryville also encouraged residential students to return to their permanent homes rather than campus residences. All remaining NCAA practices and competitions were cancelled for the spring semester. On March 16, 2020, Maryville announced its decision to suspend on-campus classes and remain in a virtual learning format. Maryville conducted move out for residential students on March 17 through 19. On March 21, 2020, the St. Louis city and county governments enacted stay-at-home orders, effective from 12:01 a.m. on March 23 until 11:59 p.m. on April 22, 2020 (which were later extended), which limited Maryville's operations to continue providing only virtual / remote learning. As of March 23, 2020, all of Maryville's buildings on campus were effectively closed. All on-campus and off-campus university-sponsored events through May 16, 2020 were cancelled, moved to a virtual format or postponed until further notice. In the fall of 2020, Maryville reopened its campus in a limited capacity and subject to a variety of Coronavirus / COVID-19-related restrictions, limitations and modifications. To date, Maryville's insured property remains impaired and not ready for operations under the same or equivalent physical and operating conditions that existed prior to the initial loss and damage.

36. Even with limited testing available at the time, the first case of COVID-19 in St. Louis was reported on March 3, 2020, and the first death on March 22, 2020. The first case of COVID-19 in Kansas City was reported on March 7, 2020, and the first death on March 12, 2020.

37. To date, there have been nearly 500,000 reported cases of COVID-19 in Missouri and over 7,000 deaths. In St. Louis County, there have been over 85,000 reported cases of COVID-19 and close to 2,000 deaths. In Jackson County, there have been nearly 30,000 reported cases of COVID-19 and over 300 deaths.

38.     At Maryville, there have been nearly 170 reported cases of COVID-19 on its campus.

39.     At Rockhurst, there have been over 200 reported cases of COVID-19 associated with its main campus. During the claim submission process, and at FM Global's request, Rockhurst provided FM Global documentation of a student, contractor and employee who were on campus that tested positive for COVID-19, as follows:

- Student:  A Rockhurst student was tested for COVID-19 on March 20, 2020, with a positive result stated in a report issued April 8, 2020, a copy of which was provided to FM Global with personal identifying information redated. Prior to then, it is Rockhurst's understanding that this student was last on Rockhurst's campus on March 5, 2020, immediately prior to the University's Spring Break.

- Contractor:  An employee of a cleaning service contractor was tested for COVID-19 on May 26, 2020 and informed of a positive test result on May 28, 2020. Prior to then, this individual had done cleaning work at numerous locations on Rockhurst's campus on three days during the prior week and two days during the week in which the individual was tested. A copy of the documentation that Rockhurst received with respect to this individual was provided to FM Global.

- Employee. An employee in Rockhurst's campus security department was tested for COVID-19 on June 12, 2020, with a positive result reported on June 13, 2020 (a copy of which was provided to FM Global with personal identifying information redated). Prior to then, this individual was present at numerous locations on Rockhurst's campus throughout the individual's work period from May 28, 2020 to June 11, 2020.

40.     Given the absence of commercially-available tests for surface and aerosol presence of the SARS-CoV-2 virus, and the lack of available testing for humans (especially in the early stages of the pandemic), a laboratory confirmed test result (as FM Global has insisted Plaintiffs must provide as far back as March 2020), are not and cannot be the only means of proving the presence of the Coronavirus / COVID-19. For example, statistical modeling confirms, beyond any reasonable doubt and to a high degree of statistical certainty, that the Coronavirus / COVID-19 was present on Plaintiffs' campuses as of March 2020 and has continued to be present throughout the ongoing pandemic.

13

41.     The SARS-CoV-2 virus that causes COVID-19 has a physical presence. It can exist in the air, on surfaces and on objects for indeterminate periods of time and can be transferred from the air, surfaces and objects into human bodies. When present in the air, on surfaces and on objects, the SARS-CoV-2 virus makes the air and those surfaces and objects dangerous transmission mechanisms for COVID-19. Accordingly, the presence of the Coronavirus and COVID-19 in and on property, including in the air, on surfaces and on objects, causes physical loss or damage to property by causing physical harm to and altering property and eliminating the utility and habitability of such property or otherwise making it incapable of being used for its intended purpose.

42.     The omnipresence of Coronavirus and COVID-19 is enabled by multiple modes of viral transmission, including respiratory droplet, airborne, and fomite transmission (*i.e.*, transmission from surfaces and objects). These transmission methods further demonstrate that Coronavirus and COVID-19 cause physical loss or damage to property.

43.     The SARS-CoV-2 virus and the resulting COVID-19 disease was and has been physically present on Plaintiffs' insured property and in surrounding areas since at least March 2020. During Plaintiffs' normal campus operations, there are many thousands of students, faculty, employees and other visitors throughout their campuses. Given the nature of the virus and its community spread, persons infected with COVID-19 have been present on Plaintiffs' campuses and in surrounding areas since at least March 2020.

44.     By the time Plaintiffs announced in mid-March their decisions to suspend normal campus operations and effectively close their campuses, the SARS-CoV-2 virus and the resulting COVID-19 disease had been present on their insured property and in surrounding areas – and

presented an existing and continuing threat to persons and property at those locations; a dangerous condition by any measure.

45.    The SARS-CoV-2 virus has been present in the air and on surfaces on property adjacent to and near Plaintiffs' property and in the surrounding community, including as of the time various orders were issued by national, state and local governments in response to the presence of the virus and the resulting COVID-19 disease, which impacted Plaintiffs' and others' ability to access and use their property during the ongoing pandemic.

46.    The presence of the SARS-CoV-2 virus (and the resulting COVID-19 disease) on Plaintiffs' property and other nearby property and in the air at such property physically altered such property and air and transformed them into dangerous COVID-19 disease transmission mechanisms sufficient to constitute physical loss or damage to property within the meaning of the Policy.

47.    The presence of the SARS-CoV-2 virus (and the resulting COVID-19 disease) on Plaintiffs' property and other nearby property and in the air at such property effectively eliminates the utility and habitability of such property sufficient to constitute physical loss or damage to property within the meaning of the Policy.

48.    The imminent risk of the presence of the SARS-CoV-2 virus (and the resulting COVID-19 disease) on Plaintiffs' property and other nearby property and in the air at such property effectively eliminates the utility and habitability of such property sufficient to constitute physical loss or damage to property within the meaning of the Policy.

49.    Plaintiffs' insured property has been subject to a variety of COVID-19-related limitations, restrictions, and prohibitions, including by orders issued at various times beginning in March 2020 by national, state and local governments in response to the presence of the

15

Coronavirus, COVID-19 and the ongoing pandemic (sometimes referred to as "stay-at-home orders"), which are matters of public record. The effect of these orders was to limit, restrict or prohibit partial or total access to Plaintiffs' insured locations. At least some of these orders were the direct result of, among other things, physical damage of the type insured at an insured location or within five statute miles of it.

50. Thus, Plaintiffs sustained physical loss or damage to covered property as a result of the SARS-CoV-2 virus, COVID-19 and the ongoing pandemic; thereby triggering coverage under the Policy's "All Risks" coverage for Plaintiffs' resultant losses and damage, including as provided in the many coverages stated in the Property Damage and Time Element sections of the Policy.

51. The condition of Plaintiffs' insured property has not returned to its condition prior to the initial loss and damage. The presence of the Coronavirus, COVID-19 and the ongoing pandemic have caused Plaintiffs to suffer substantial business interruption losses and other expenses. As more fully described above, Plaintiffs' losses and expenses include, among other things, a Spring 2020 room and board refund of more than $2 million each, plus additional losses and expenses (which are continuing) currently in excess of several million more – all attributable to the Coronavirus, COVID-19 and the ongoing pandemic.

**The Coronavirus and the COVID-19 Pandemic**

52. The SARS-CoV-2 virus has spread widely and rapidly across the United States. Evolving evidence indicates that the SARS-CoV-2 virus, responsible for COVID-19, was present in the United States as early as December 2019. Although the virus and related illness are distinct, for purposes of this Complaint, Plaintiff sometimes refers to both interchangeably as "COVID-19."

53. COVID-19 is a highly contagious, uniquely resilient, and potentially deadly communicable disease.

54. As early as February 26, 2020, the Centers for Disease Control and Prevention (CDC) advised that COVID-19 was spreading freely and without the ability to trace the origin of new infections, also known as community transmission.

55. On March 11, 2020, the WHO declared COVID-19 to be a pandemic. As such, the COVID-19 disease and its causative virus, SARS-CoV-2, are presumed to be present or imminently present everywhere by that time.

56. On March 16, 2020, the CDC and the national Coronavirus Task Force issued to the American public guidance titled "30 days to Slow the Spread" of COVID-19. The guidance called for restrictive social distancing measures, such as working from home, avoiding gatherings of more than 10 people, and staying away from bars and restaurants, among other things. State and local governments also recognized at this time the unprecedented and catastrophic situation of the mushrooming outbreaks of COVID-19 and the direct physical loss or damage that they were inflicting upon property and lives. As a consequence, state and local governments, including in the areas impacting Plaintiffs' campuses, issued various orders to address the presence of the Coronavirus and the COVID-19 pandemic. Many of these orders expressly recognize that the Coronavirus damages property – not just people.

57. While early in the COVID-19 pandemic, testing was limited, and thus potentially thousands more were infected than were reported; with respect to the testing that was available, positivity rates clearly demonstrated the pervasiveness of the Coronavirus by March 2020.

58. The sheer ubiquity of the Coronavirus and the COVID-19 disease is not simply reflected in individuals' positive test results. The CDC estimates that the number of people in the

17

United States who have been infected with COVID-19 is likely to be 10 times higher than the number of reported cases.

59.     A growing body of evidence suggests that the virus transmits both through droplets, when someone sneezes and coughs, and aerosols, which are produced by normal breathing.

60.     Aerosols are particularly concerning because unlike droplets, which stay airborne for only a few seconds, aerosols are water droplets suspended in air and can remain suspended for hours, until gravity ultimately forces them to the nearest surface below.

61.     Consequently, aerosols can spread widely through air flow and settle on surfaces hundreds of feet away from any infected individual. Thus, someone not even in the vicinity of an infected person can unknowingly touch an infected surface, later touch their face, and become infected.

62.     As a result, at least 42 states and countless local governments, including in areas impacting Plaintiffs' campuses, issued substantially similar "stay at home" orders, the purpose of which was to address the presence of the Coronavirus and spread of COVID-19. Many of these orders expressly recognize that the Coronavirus damages property – not just people.

63.     According to the CDC, everyone is at risk of getting COVID-19. The virus can spread by respiratory droplets when an infected person coughs, sneezes, or talks. A person can become infected from respiratory droplets or potentially by touching a surface or object that has the virus on it and then by touching the mouth, nose, or eyes.[2]

64.     According to studies, the virus can live on surfaces for several days if not longer.[3] The New England Journal of Medicine reported finding that experimentally-produced aerosols

---

[2]     https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[3]     https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf

18

containing the virus remained infectious in tissue-culture assays, with only a slight reduction in infectivity during a 3-hour period of observations. "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces…."[4]

65.     The study also found that the Coronavirus was detectable for up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel.[5]

66.     All of these materials, and others similarly susceptible to the Coronavirus, are used by Plaintiffs throughout their facilities and operations.

67.     The study's results indicate that individuals can become infected with COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.

68.     A consensus appears to be emerging that Coronavirus can travel through the air via aerosols. For example, aerosol scientist Lidia Morawska of the Queensland University of Technology in Brisbane, Australia told *Nature* that, "In the minds of scientists working on this, there's absolutely no doubt that the virus spreads in the air. This is a no-brainer."[6]

69.     An April 2020 study published in the journal *Emerging Infectious Diseases* found a wide distribution of Coronavirus on surfaces and in the air about *13 feet* from patients in two hospital wards in Wuhan, China, leading the authors to conclude that the virus spreads in aerosols in addition to large respiratory droplets. The investigators found evidence of the virus in swabs of floors, computer mice, trash bins, bed handrails, patients' face masks, health workers' personal protective equipment, and air vents.[7]

---

[4]     https://www.nejm.org/doi/full/10.1056/NEJMc2009324

[5]     https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces

[6]     https://www.nature.com/articles/d41586-020-00974-w

[7]     https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

70.     The authors also surmised that the high rate of positivity for floor samples in the hospital strongly suggest that droplets fall to the ground and then are spread via footwear contacting the droplets on the ground. For example, every sample tested from the pharmacy floor tested positive for Coronavirus even though no patients were housed there.[8]

71.     Another study conducted in Wuhan indicates that staff movement, floor cleaning, and the removal of personal protective equipment could transmit Coronavirus through the re-suspension of virus-contaminated aerosols.[9]

72.     Kimberly Prather, an aerosol chemist at the University of California, San Diego told *Science* magazine: "I'm relieved to see aerosolization is accepted. This added airborne pathway helps explain why it is spreading so fast."[10]

73.     Aerosol particles are held in the air by physical and chemical forces. The suspended particles remain for *hours or more*, depending on factors such as heat and humidity. If virus particles can be suspended in air for more than a few seconds, like, for instance, the measles virus can, then anyone passing through could become infected by a pathogenic aerosol cloud. And the virus can travel long distances and land on surfaces, only to be stirred back up into the air later by cleaning or other disturbances.

74.     In a study published on October 7, 2020, researchers at Australia's national science agency found that Coronavirus can survive for up to 28 days on common surfaces like cash, glass,

---

[8]     https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

[9]     https://www.biorxiv.org/content/10.1101/2020.03.08.982637v1

[10]     https://www.sciencemag.org/news/2020/04/you-may-be-able-spread-coronavirus-just-breathing-new-report-finds#

20

vinyl, and stainless steel.[11] The study also determined that the virus survives longer at colder temperatures, a particular concern during winter in the United States.

75.    Dr. Debbie Eagles, one of the Australia study's lead researchers, said: "Our results show that SARS-CoV-2 can remain infectious on surfaces for long periods of time, reinforcing the need for good practices such as regular handwashing and cleaning surfaces."[12]

76.    The SARS virus that caused a 2003 epidemic is a coronavirus and is similar to the Coronavirus responsible for COVID-19. As a result, the behavior of SARS during the 2003 epidemic provided evidence about aerosol risk from the current Coronavirus.

77.    A 2014 analysis published in the journal *Clinical Infectious Diseases* investigated a seemingly puzzling outbreak in a Hong Kong apartment complex whose residents had not been in close contact with each other.[13] The study found that "airborne spread was the most likely explanation, and the SARS coronavirus could have spread over a distance of 200 meters," or about 600 feet.[14]

78.    The implications of airborne spread of Coronavirus are extremely serious. Airborne spread means that the virus can travel long distances from any infected person. It can then infect someone who unknowingly walks through a pathogenic cloud. It can also infect someone by settling on a physical surface, which someone touches and later becomes infected. And regardless of the transmission method, the evidence suggests that COVID-19 can be transmitted by shoes even once it reaches the ground.

[11]    https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7
[12]    https://www.sciencedaily.com/releases/2020/10/201011220759.htm
[13]    https://academic.oup.com/cid/article/58/5/683/365793
[14]    *Id.*

21

79.     At various times, national, state and local governments issued orders to address the presence of the Coronavirus and the COVID-19 pandemic, and the physical loss or damage that they were inflicting upon property and lives, all as reflected in the very text and context of these orders.

80.     These national, state and local orders (including such orders issued in response to physical loss or damage at Plaintiffs' insured locations and/or within five miles of Plaintiffs' insured locations) limited, restricted and/or prohibited partial or total access to Plaintiffs' insured property and impacted Plaintiffs' campus operations; requiring, among other things, Plaintiffs to undertake additional cleaning and other measures and to follow disease mitigation advice from the CDC and other public health agencies.[15] The CDC and other public health agencies recommended and continue to recommend enhanced cleaning and other disease mitigation measures (like social distancing) to combat the pandemic spread of COVID-19.[16] As a result, Plaintiffs have incurred increased costs to clean, disinfect and sanitize their property. Physical distancing measures have also been costly for Plaintiffs to implement and have yielded reduced capacities and use restrictions at Plaintiffs' insured property, resulting in business interruption losses and other added expenses.

## The SARS-CoV-2 Virus Causes Actual Physical Damage, Including Adverse Alteration

81.     When SARS-CoV-2 viral particles come in contact with property, that property suffers actual physical damage, including adverse alteration.

82.     To understand why the SARS-CoV-2 virus has had such devastating health consequences and also has resulted in so much physical loss and damage to property and so many

---

[15]     *E.g.*, https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html; https://www2.illinois.gov/ Pages/Executive-Orders/ExecutiveOrder2020-10.aspx
[16]     *E.g.*, https://www.cdc.gov/coronavirus/2019-ncov/community/reopen-guidance.html

government-ordered or privately undertaken business shutdowns, one must understand the manner in which the virus interacts with the physical environment and why SARS-CoV-2 triggers the insurance protection provided by Plaintiffs' policy.

83.     The SARS-CoV-2 virus is expelled from the mouth and/or nose, and it travels within respiratory droplets when humans cough, sneeze, scream, sing, or even speak loudly or breathe heavily.

84.     Mouth and nose secretions, including saliva, nasal discharge, and respiratory secretions such as mucus, form an aerosol cloud in the surrounding air. The expelled aqueous droplets contain multiple copies of suspended infectious SARS-CoV-2 viral particles. The mouth- and nose- emitted droplets are approximately spherical in shape and widely vary by size. Scientific literature somewhat arbitrarily divides these droplets into "small" droplets (those less than about 5 microns in diameter) and "large" droplets (those exceeding about 5 microns in diameter). Because the SARS-CoV-2 viral particle diameter is roughly 100 nanometers (*i.e.*, 0.1 microns) even a 5-micron respiratory droplet can easily accommodate many thousands of SARS-CoV-2 viral particles.

85.     Droplet size is the most important determinant of aerosol behavior, including the length of travel of the expelled respiratory droplets. Large droplets (as defined above) within an aerosol plume are strongly affected by gravity; for example, 50- to 100-micron droplets typically will travel only up to a couple of meters before they fall to the ground or land on another surface. In contrast, small droplets (as defined above) can remain airborne almost indefinitely under most indoor conditions and can travel with air currents long distances. Whatever their size, virus-containing droplets eventually encounter physical objects and surfaces (called fomites) and can settle there.

86. Once expelled from the mouth and/or nose, aqueous droplets, including virus-containing ones, can attach to surfaces. The suspended viral particles can then themselves collide with the surface and nonspecifically adsorb to it (*i.e.*, form a noncovalent chemical bond with the surface). Furthermore, the landed droplet's water will undergo evaporation, and eventually some fraction of the viral particles may end up being deposited onto the surface either directly or indirectly (*i.e.*, through other solids contained in the droplet).

87. There is a distinction between viral particles that are adsorbed to a host surface and those simply deposited onto it. In the former case, as stated above, there is an actual chemical bond between the viral particle and the surface; in this scenario, the viral particle is relatively hard to detach. In contrast, the deposition entails merely a physical presence of the viral particle on the surface and is more easily removed.

88. In addition, there are various intermediate scenarios in between the virus being adsorbed and merely deposited. For example, some endogenous polymeric molecules present in respiratory droplets (such as polysaccharides and proteins) may act as a "bridge" binding the virus to the surface. Also, electrostatic attraction between the surface and the viral particles may play a role in addition to basic gravity. Furthermore, porous objects like fabrics represent a special case because they may entrap viral particles, thus making them hard to access, inactivate, or remove. In this case, the original respiratory droplets are first absorbed by the fabric; once their water subsequently evaporates, the viral particles become embedded and entangled within the bulk of the object.

89. The type of bond that forms between viral particles and physical objects varies depending on the type of object, and often markedly so. The interaction of both the virus-containing respiratory aqueous droplets and the viral particles themselves with surfaces depends

24

on the nature of the latter. For example, when it adheres to a clean glass (or another hydrophilic) surface, an aqueous droplet spreads out; this increases the droplet's footprint on the surface and facilitates evaporation of the moisture. In contrast, when an aqueous droplet lands on plastic objects (or other objects with hydrophobic or greasy surfaces), it beads up, thereby minimizing its contact area and diminishing the evaporation. Likewise, the viral particle's propensity to adsorb to a surface strongly depends on the nature of the latter: in general, one would expect the tendency of the viral particles to adsorb to be more pronounced in the case of hydrophobic, as opposed to hydrophilic, surfaces. Furthermore, whether an adhered (deposited, adsorbed, or in between) viral particle remains stuck to the surface and, if so, whether it retains its infectivity should depend on the properties of the host surface as well.

90. With respect to the retention of the viral particles on the surface, numerous additional factors (*i.e.*, those besides the type of the host object) may have a substantial effect: how smooth and clean the surface is, temperature, relative humidity, and airflow (*e.g.*, ventilation).

91. The bond between viral particles and physical objects persists until broken through intervening forces.

92. If left undisturbed, the virus-surface bond will persist. Whether adsorbed or simply physically deposited (and in various intermediate scenarios), viral particles will remain on the surface indefinitely if left undisturbed. Some studies suggest that SARS-CoV-2 can be detected on certain surfaces many weeks after infected persons have departed, with the SARS-CoV-2 virus remaining viable for as long as seven days on a range of common surfaces, including plastic, stainless steel, glass, and wood; other researchers have found viable SARS-CoV-2 samples on glass, stainless steel, and paper currency for up to approximately a month under indoor conditions.

25

93.     Physical objects that have been altered through the formation of a bond with viral particles are dangerous. Humans can become infected by touching, or otherwise coming in contact with, an object to which viral particles have attached for as long as the virus remains infective. In fact, this is one of the three recognized main mechanisms of spreading COVID-19; the other two are a direct transmission from an infected person to people in close proximity via large respiratory droplets ("person-to-person transmission"; if inhaled, such large droplets deposit primarily in the upper airways of the head and neck) and also an indirect transmission via small aerosol particles traveling over long distances ("airborne transmission"; if inhaled, such small droplets deposit primarily in the lower respiratory tract). When a person touches a surface containing an infectious virus and then his/her mouth, eyes, or nose, the person may become infected.

94.     Airborne transmission can be exacerbated through HVAC systems that are defective and rendered unreasonably dangerous through the absorption and then redistribution of SARS-CoV-2 viral particles across entire buildings, with studies finding wide dispersion of the SARS-CoV-2 virus and confirmed presence on ceiling vent openings, vent exhaust filters, ductwork and other surfaces more than 50 meters from the original human source.

95.     By bonding with, and becoming part of, the property that it comes in contact with, the SARS-CoV-2 virus adversely alters the physical object, as well as the building in which that object is located. Both the object and the building are transformed from safe for occupancy and commercial activity to property that is uninhabitable, unfit for its intended purpose, dangerous and, indeed, potentially deadly. In short, the property is physically damaged. And even the owners of personal property or buildings that are potentially infected by SARS-CoV-2 or under threat of infection from SARS-CoV-2 if used or occupied during a pandemic (such as the COVID-19 pandemic) have effectively incurred a loss to property, because - simply put - the personal property

Case 4:20-cv-00581-BCW   Document 41   Filed 03/11/21   Page 26 of 57

or buildings are no longer safe, habitable or fit for their intended purpose until the pandemic conditions have been controlled and ultimately eliminated.

**Plaintiffs' FM Global Advantage Policy**

96.     FM Global provided coverage to Plaintiffs on the same standard FM Global Advantage policy form for the term July 1, 2019 to July 1, 2020. FM Global agreed to a "maximum limit of liability in an occurrence, including any insured TIME ELEMENT loss" of "USD 278,126,000" (Rockhurst) and "USD 314,116,000" (Maryville). A true and correct copy of the Rockhurst policy is attached hereto as Exhibit A. A true and correct copy of the Maryville policy is attached hereto as Exhibit B. The Rockhurst policy and Maryville policy are sometimes collectively referred to in this Complaint as the Policy.

97.     FM Global drafted the Policy.

98.     The Policy identifies Plaintiffs' main campuses on the Schedule of Locations, among other insured locations covered by the Policy.

99.     The Policy is an "all risks" insurance policy, which provides coverage to Plaintiffs for "ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as . . . excluded . . . ." Thus, all risks not otherwise excluded are covered causes of loss.

100.    The Policy contains two independent triggers of coverage. The Policy insures against "physical loss" of property and, separately, against "damage" to property.

101.    As used in the Policy, the term "physical loss" is separate, distinct, and has an independent meaning from the term "damage."

102.    The Policy does not define the term "physical."

103.    The Policy does not define the term "physical loss."

104.    The Policy does not define the term "damage."

27

105.     The Policy does not define the phrase "physical loss or damage."

106.     When undefined, the phrase "physical loss or damage" is susceptible to more than one reasonable interpretation. As such, it must be interpreted against the drafter and in favor of coverage consistent with the "All Risks" nature of the Policy.

107.     FM Global is on record in other non-COVID-19 litigation asserting that the undefined phrase "physical loss or damage" in all-risk policies is susceptible of more than one reasonable interpretation, is therefore ambiguous and must be construed against the policy drafter. In that same case, FM Global asserted that numerous courts have concluded that "loss of functionality or reliability . . . constitutes physical loss or damage" under all-risk policies.

108.     The Policy was in effect in March 2020, which is when Plaintiffs' losses and damage caused by the presence of the Coronavirus, COVID-19 and the ongoing pandemic first began (*i.e.*, on or about mid-March, 2020). Such losses and damage are ongoing.

109.     By its terms, the expiration of the Policy period does not limit the Period of Liability under the Policy's various coverage parts. The Policy's Period of Liability under various coverage parts triggered by Plaintiffs' claims has not ended or reached the applicable Time Limit.

110.     Plaintiffs paid all premiums required by the Policy. For this Policy, Plaintiffs paid an annual policy premium of $131,790 (Rockhurst) and $194,825 (Maryville).

111.     Plaintiffs are Named Insureds under the Policy.

112.     FM Global is the effective and liable insurer of the Policy and policies meeting the class definitions.

### The Policy's "All Risks" Coverage Is Triggered

113.     Because Plaintiffs' Coronavirus / COVID-19 and ongoing pandemic related losses and damage directly resulted from physical loss or damage to property insured under the Policy,

and no exclusion applies, Plaintiffs' losses and damage are covered under the Policy's "All Risks" coverage. Plaintiff has complied with all provisions of the Policy or such compliance has been waived or excused.

114. The "All Risks" coverage that FM Global sold to Plaintiffs "covers property, as described in this Policy, against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy." Business interruption losses are covered by the Policy's Time Element coverage, which "insures TIME ELEMENT LOSS, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured."

115. The meaning of the phrase "physical loss or damage of the type insured" is informed by, among other things, the specifically enumerated set of coverages and related provisions under a Sub-Section of the Policy called "OTHER ADDITIONAL COVERAGES" under the Policy's "PROPERTY DAMAGE" Section and another specifically enumerated set of coverages and related provisions under a Sub-section of the Policy called "ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS" under the Policy's "TIME ELEMENT" Section.

116. With respect to the "ADDITIONAL COVERAGES" provided under the "PROPERTY DAMAGE" section, the Policy describes these Additional Coverage as "Additional Coverages *for insured physical loss or damage*." (emphasis added). In other words, *each* of the Additional Coverages under this *property* policy provides coverage for losses or costs for "insured physical loss or damage" to property.

117. One of the Policy's "ADDITIONAL COVERAGES" for "PROPERTY DAMAGE" is "COMMUNICABLE DISEASE RESPONSE COVERAGE" which concerns costs for "the actual not suspected presence of communicable disease." In other words, the Policy

Case 4:20-cv-00581-BCW   Document 41   Filed 03/11/21   Page 29 of 57

equates the presences of a "communicable disease" at property with physical loss or damage of the type insured under the Policy. As this coverage part makes plain that "communicable disease" at a location constitutes a physical loss or damage to property under the Policy, as all coverage parts under the Policy provide coverage for losses and/or costs that flow from "physical loss or damage to property," "communicable disease" is a covered cause of loss for all of the coverages afforded under the "all risks" property Policy.

118.    Similarly, with respect to the coverage provided by the "ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS" under the Policy, the Policy describes all of its "TIME ELEMENT" coverages as being for losses insured "as provided in the TIME ELEMENT COVERAGES, directly resulting *from physical loss or damage of the type insured* . . . to *property* described elsewhere in this Policy . . . ." (emphasis added). In other words, *each* of the Time Element coverages under this *property* policy provides coverage for certain losses and/or costs resulting from "insured physical loss or damage" to property.

119.    One of the Policy's "ADDITIONAL TIME ELEMENT COVERAGE EXTENSION" is "INTERRUPTION BY COMMUNICABLE DISEASE" which covers lost earnings or lost profits and extra expenses resulting from "the actual not suspected presence of communicable disease" at an insured location. In other words, the Policy, again, equates the presence of a "communicable disease" with physical loss or damage of the type insured under the Policy.

120.    The Policy which has an exclusion for "contamination" and "cost" "due" to "contamination" defines "communicable disease" differently from "contamination." "Communicable disease" is a "disease which is . . . transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges . . . ." By contrast,

Case 4:20-cv-00581-BCW    Document 41    Filed 03/11/21    Page 30 of 57

"contamination" is "any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew."

121.    The Policy does not include in the definition of "contamination" "any condition of property due to the actual or suspected presence of . . . communicable disease" (which includes "disease . . . transmissible from . . . [an] individual's discharges") but instead not only separately defines "communicable disease" differently from "contamination," it also expressly equates the presence of "communicable disease" with "physical loss or damage" to property expressly of the type insured under the Policy. Or, in other words, the "contamination" exclusion does not reach "communicable disease" because the Policy otherwise covers losses resulting from the covered cause of loss of "communicable disease."

122.    The Policy provides several different types of coverages resulting from the covered cause of loss of "communicable disease" in addition that are applicable to Plaintiffs' past, current and future COVID-19-related losses. These coverages are set forth in Policy's section titled PROPERTY DAMAGE and its sub-section titled ADDITIONAL COVERAGES, and section titled TIME ELEMENT and its sub-sections titled TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS, all of which are incorporated herein by reference. Plaintiffs are entitled to recover up to the Policy's limits of liability. FM Global has not acknowledged coverage or paid Plaintiffs for any of their covered losses or damage.

123.    More specifically, and as particularly relevant here (although without limitation), Plaintiffs identify the following coverages triggered by Plaintiffs' claim for COVID-19-related losses and damage. Plaintiffs expect that when the identification and quantification of all of its losses and damage (which remain ongoing) are fully known, additional coverages under the Policy

31

may be applicable. The following is not a comprehensive discussion of all potentially applicable policy coverages, terms, and conditions, which are fully set forth in the Policy.

### *Loss or Damage to Property and Direct Time Element Losses*

124.    The Policy provides coverage for physical loss or damage to Real Property and/or Personal Property (as defined in the Policy), unless such property is excluded or results from an excluded cause of loss. This coverage extends to Plaintiffs' physical loss or damage to covered property caused by the presence of the Coronavirus / COVID-19 communicable disease at Plaintiffs' insured locations and/or within 1,000 feet thereof.

125.    Plaintiffs have incurred substantial covered losses as a consequence of loss or damage to their property as a result of direct exposure of (and actual adverse physical alteration of) its own covered Real Property and Personal Property.  This actual adverse physical alteration of their property as a result of the Coronavirus adhering to the property and resulting adverse alteration of the property, requiring either remediation or disposal and replacement.

126.    This coverage also extends to physical loss to covered property as a result of the threat of the Coronavirus / COVID-19 becoming present at Plaintiffs' locations and the resulting danger posed by such locations becoming a disease vector for COVID-19. Such threat has caused covered loss at Plaintiffs' locations.

127.    The Policy also covers Plaintiffs' "Time Element" losses as a result of the Coronavirus / COVID-19 communicable disease as provided under multiple Time Element coverages set forth under the Policy. The loss insured by the TIME ELEMENT coverage also includes the "expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy."

32

128.     Under the Policy's Time Element coverages, the Policy permits Plaintiffs to elect to make a claim based on either: "a) GROSS EARNINGS and EXTENDED PERIOD OF LIABILITY; or b) GROSS PROFIT[.]" The Policy's Time Element coverages also separately provide for TUITION FEES as a measurement of loss.

129.     Plaintiffs are entitled to recover their covered losses with respect to physical loss or damage to their property caused by the Coronavirus / COVID-19 communicable disease, and resulting Time Element losses, up to the limits provided in the Policy.

130.     FM Global has not acknowledged coverage or agreed to pay Plaintiffs for any of their covered Property Damage or Time Element losses.

### *Losses Due to Orders of Civil Authority*

131.     The Policy provides coverage for losses resulting from the temporary closure or suspension or limitation of access to Plaintiffs' insured locations as a result of orders of civil or military authority resulting from physical loss or damage caused by the Coronavirus / COVID-19 communicable disease at or within 5 miles of Plaintiffs' insured locations.

132.     The applicable language of the Policy describing this coverage includes the following:

> **A.     CIVIL OR MILITARY AUTHORITY**
>
> This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.
>
> This Extension does not apply to LEASEHOLD INTEREST.
>
> The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

33

The period of time:

1)      starting at the time of such physical damage; and

2)      ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

133.     The Policy provides for 30 consecutive days of coverage for losses due to each Order of Civil or Military Authority under the circumstances of Plaintiffs' losses.

134.     The coverage applies separately with respect to each particular Order of Civil or Military Authority and as to each insured location.

135.     Plaintiffs are entitled to recover separately for each Order of Civil or Military Authority limiting, restricting or prohibiting partial or total access to each particular covered location.

136.     Plaintiffs have incurred substantial covered losses due to Orders of Civil or Military Authority that were entered as a consequence of damage to property of Plaintiffs and/or to property belonging to third parties. Such damage to property was of the type covered under the Policy including, without limitation, the presence of communicable disease (*i.e.*, COVID-19) at or within five statute miles/eight kilometers of Plaintiffs' covered locations.

137.     Plaintiffs are entitled to recover their covered Civil or Military Authority losses, up to the limits provided in the Policy.

138.     FM Global has not acknowledged coverage or agreed to pay Plaintiffs for any of their covered Civil or Military Authority losses.

34

*Losses Due to Impairment of Ingress or Egress*

139.    The Policy provides coverage for time-element losses due to partial or total physical prevention of ingress to or egress from Plaintiffs' insured locations. Due to, among other things, restrictions on travel or movement occasioned by physical damage caused by the presence of the Coronavirus / COVID-19 communicable disease, Plaintiffs have incurred recoverable time element losses due to impairment of ingress or egress and resulting interruption of their business.

140.    The applicable language of the Policy describing this coverage includes the following:

### C. INGRESS/EGRESS

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)      lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2)      picketing or other action by strikers except for physical damage not excluded by this Policy.

3)      physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

35

The period of time:

1)    starting at the time of such physical damage; and

2)    ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

141.    Plaintiffs have incurred substantial covered losses due to "partial or total" Loss of Ingress / Egress as a consequence of the Coronavirus / COVID-19 communicable disease.

142.    Plaintiffs are entitled to recover their covered Ingress/Egress losses, up to the limits provided in the Policy.

143.    FM Global has not acknowledged coverage or agreed to pay Plaintiffs for any of their covered Ingress/Egress losses.

***Communicable Disease Response***

144.    As an additional coverage, the Policy provides coverage for response costs incurred as a result of the presence of communicable disease such as COVID-19.

145.    The applicable language of the Policy describing this coverage includes the following:

**G.    COMMUNICABLE DISEASE RESPONSE**

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)    an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)    a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

36

this Policy covers the reasonable and necessary costs incurred by the Insured at such location with the actual not suspected presence of **communicable disease** for the:

1)     cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

2)     actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

COMMUNICABLE DISEASE RESPONSE Exclusions: As respects COMMUNICABLE DISEASE RESPONSE, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)     **terrorism.**

146.    COVID-19 qualifies as a "Communicable Disease" under the Policy.

147.    Plaintiffs' insured locations have had the actual presence of the COVID-19 communicable disease, which resulted in access to such locations being limited, restricted or prohibited in excess of 48 hours pursuant to an order and/or decision as required for this additional coverage.

148.    As a result, Plaintiffs have incurred costs for the cleanup, removal and/or disposal of the COVID-19 communicable disease from their insured property.

37

149.     These costs are covered under the Policy, up to the limits provided in the Policy.

150.     FM Global has not acknowledged coverage or agreed to pay Plaintiffs for any of their covered Communicable Disease Response costs.

*__Interruption by Communicable Disease__*

151.     As an additional coverage, the Policy provides coverage for interruption/time-element losses incurred as a result of the actual presence of the COVID-19 communicable disease.

152.     The applicable language of the Policy describing this coverage includes the following:

> **E.      INTERRUPTION BY COMMUNICABLE DISEASE**
>
> If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:
>
> 1)      an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or
>
> 2)      a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,
>
> this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.
>
> This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.
>
> INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusions apply:
>
> This Policy does not insure loss resulting from:
>
> 1)      the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

38

2)      loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)      starting at the time of the order of the authorized governmental agency or the Officer of the Insured; and

2)      ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

153.    COVID-19 qualifies as a "Communicable Disease" under the Policy.

154.    Plaintiffs' insured locations have had the actual presence of the COVID-19 communicable disease, which resulted in access to such locations being limited, restricted or prohibited in excess of 48 hours pursuant to an order and/or decision as required for this coverage.

155.    As a result, these locations have incurred interruption/time-element losses.

156.    These interruption/time-element losses are covered under the Policy, up to the limits provided in the Policy.

157.    FM Global has not acknowledged coverage or agreed to pay Plaintiffs for any of their interruption/time-element losses covered by Interruption by Communicable Disease.

***Expediting Costs and Extra Expense***

158.    The Policy provides coverage for Expediting Costs and Extra Expenses incurred by Plaintiffs to minimize covered losses.

39

159.     The applicable policy language describing this coverage includes the following language applicable to Expediting Costs incurred to expedite the repair or replacement of physically damaged property:

### M.     EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1)      for the temporary repair of insured physical damage to insured property;

2)      for the temporary replacement of insured equipment suffering insured physical damage; and

3)      to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

160.     The applicable Policy language describing this coverage includes the following language applicable to Extra Expense incurred to temporarily continue business as nearly normal as practicable and other related expenses:

### D.     EXTRA EXPENSE

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1)      extra expenses to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business;

2)      extra costs of temporarily using property or facilities of the Insured or others; and

3)      costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss

or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the INSURED OPTION clause, the PERIOD OF LIABILITY for EXTRA EXPENSE coverage will be the PERIOD OF LIABILITY applicable to the Time Element coverage option selected.

EXTRA EXPENSE Exclusions: As respects EXTRA EXPENSE, the following applies:

1)    TIME ELEMENT EXCLUSIONS C does not apply to item 3 above.

2)    The following additional exclusions apply:

       This Policy does not insure:

       a)    any loss of income.

       b)    costs that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

       c)    costs of permanent repair or replacement of property that has been damaged or destroyed. However, this exclusion does not apply to item 3 above.

       d)    any expense recoverable elsewhere in this Policy.

161.    Plaintiffs incurred substantial covered Expediting Costs and Extra Expenses in order to minimize covered losses relating to the Coronavirus / COVID-19 communicable disease

162.    Plaintiffs are entitled to recover their covered Expediting Costs and Extra Expenses incurred to minimize covered losses, up to the limits provided in the Policy.

163.    FM Global has not acknowledged coverage or agreed to pay Plaintiffs for any of their covered Expediting Costs and Extra Expenses.

41

*Protection and Preservation of Property*

164.    The Policy provides coverage for Protection and Preservation of Property.

165.    Specifically, the Policy covers "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property."

166.    The Coronavirus / COVID-19 has caused and continues to cause actual physical loss and damage to insured property. In addition, the Coronavirus / COVID-19 has threatened and continues to threaten to cause physical loss or damage to such property.

167.    This actual and threatened physical loss and damage to insured property has prompted Plaintiffs to take actions to temporarily protect or preserve their property, thereby triggering the Policy's Protection and Preservation of Property coverage.

168.    Plaintiffs are entitled to recover their covered costs to protect and preserve their property, up to the limits provided in the Policy.

169.    FM Global has not acknowledged coverage or agreed to pay Plaintiffs for any of their covered costs associated with the Policy's Protection and Preservation of Property coverage.

*Claims Preparation Costs*

170.    The Policy provides up to $25,000 plus 50% of the amount above $25,000 incurred by Plaintiffs to investigate, calculate and document their loss for purposes of submission of their claim to FM Global.

171.    The applicable policy language describing this Claims Preparation Costs coverage includes the following language:

42

### E.    CLAIMS PREPARATION COSTS

This Policy covers the actual costs incurred by the Insured:

1)    of reasonable fees payable to the Insured's: accountants, architects, auditors, engineers, or other professionals; and

2)    the cost of using the Insured's employees,

for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

This Additional Coverage will not cover the fees and costs of:

1)    attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them,

2)    loss consultants who provide consultation on coverage or negotiate claims.

This Additional Coverage is subject to the deductible that applies to the loss.

172.    Plaintiffs have incurred substantial covered Claims Preparation Costs.

173.    Plaintiffs are entitled to recover their covered Claims Preparation Costs, up to the limits provided in the Policy.

174.    FM Global has not acknowledged coverage or agreed to pay Plaintiffs for any of their covered Claims Preparation Costs.

***Other Available Coverages***

175.    The foregoing is not intended to be an exhaustive list of the various coverages available to Plaintiffs under the Policy.

43

## No Exclusion Impacts Coverage

176.    No exclusion in the Policy applies to preclude or limit coverage for Plaintiffs' claims for physical loss and damage attributable to the Coronavirus / COVID-19 at or away from Plaintiffs' insured locations, the physical loss and damage to property at Plaintiffs' insured locations, and/or the business interruption losses that have and will continue to result from the physical loss and damage to property. To the extent FM Global contends any exclusions apply, such exclusions are unenforceable.

## The "Contamination Exclusion" Does Not Apply to Plaintiffs' Claim

177.    The Policy contains a so-called "Contamination Exclusion" that provides as follows:

    **D.**    This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

        1)    **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.

        This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

The Policy in turn defines "**contaminant**" as "anything that causes "**contamination**" and defines "**contamination**" as:

    any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

178.    As noted above, the Contamination Exclusion does not apply to "communicable disease" or reach Plaintiffs' COVID-19-related losses for numerous reasons. In addition to those

44

previously outlined, the Contamination Exclusion does not apply for each of the following additional reasons, among others:

a.  **Inapplicable to the presence of virus brought on to the premises by persons with COVID-19**: The Contamination Exclusion contains an important exception providing that coverage is available if "the actual not suspected presence of **contaminant**(**s**) directly results from other physical damage not excluded by this Policy." Persons who contract the Communicable Disease of COVID-19 did so as a consequence of being exposed to others and to property that was adversely impacted by the SARS-CoV-2 virus; and, as noted, the Policy does not exclude coverage for physical damage resulting from Communicable Disease. Accordingly, to the extent loss results from infected persons bringing the SARS-CoV-2 virus onto Plaintiffs' insured locations, any resulting impact to Plaintiffs' property results from "other physical damage not excluded by this Policy" and therefore is not subject to the Contamination Exclusion.

b.  **Inapplicable to loss or damage to property caused by the "threat" of virus becoming present at a location**: The exclusion applies only to "contamination," which is limited to the "actual or suspected presence" of specified substances at a location. By its express terms, the Contamination Exclusion does not apply to losses caused by closures or other measures responding to "threatened" presence of virus.

c.  "**Contamination" Exclusions apply to traditional pollution, not to natural catastrophes such as disease outbreaks**: To the extent the SARS-CoV-2 virus is actually present or suspected of being present at pertinent locations, its presence would be the result of a natural process, as opposed to an act of pollution or contamination. So-called "contamination" exclusions, such as the form of Contamination Exclusion in the Policy, apply only to situations that reasonable policyholders would understand to constitute *polluting* activities, as opposed to natural catastrophes such as the ongoing COVID-19 pandemic.

d.  The narrow language of the so-called Contamination Exclusion stands in stark contrast with broader exclusions within the Policy for other excluded property damage (for example, with respect to the exclusion for "loss or damage directly or indirectly caused by or resulting from [nuclear contamination] . . . contributing concurrently or in any other sequence to the loss) as well as standard-form broader "virus exclusions" that are found in many other, less generous policy forms issued throughout the insurance industry. Indeed, as a means of collecting higher premiums from and attracting desired customers such as Plaintiffs, FM Global eschewed many other broader standard-form virus exclusions that have been widely available since 2006, when the Insurance Services Office published and circulated an explicit virus exclusion (the "ISO Virus Exclusion") stating "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease" and specifically stating that this exclusion applies to "all coverage" under the policy.

Rather than using an explicit and broad virus exclusion, FM Global instead opted for an exclusion that barred only virus-related damage that could fairly be described as resulting from an act of "contamination" or "pollution"; and even then, FM Global further limited the scope of the Contamination Exclusion by also permitting coverage if the "contamination" is not actually at an insured location or suspected to be at an insured location, or if the contamination itself resulted from a covered instance of loss or damage to property.

e.  The Contamination Exclusion excludes only "contamination, and any ***cost*** resulting from contamination," (emphasis added), but makes no mention of "losses" and does not purport to exclude "loss or damage to property" resulting from Contamination. Thus, the Contamination Exclusion is expressly directed solely at any costs incurred to remove the contamination from covered property, but not to consequential economic losses such as, *e.g.*, time-element losses or extra expenses.

f.  The Contamination Exclusion is directed solely at "conditions of property" and thus does not address, *e.g.*, time-element losses due to civil authority orders or impairment of ingress or egress occasioned by covered Communicable Disease.

179.  In short, the Policy reflects FM Global's deliberate decision to exclude only virus contamination resulting from acts of pollution (such as inadvertent or deliberate releases of waste streams from a lab, water-treatment plants, or other facilities). The Contamination Exclusion is inapplicable to any of the COVID-19-related losses that Plaintiffs incurred.

### *The Policy's Communicable Disease Sublimit Does Not Cap Plaintiffs' Recovery*

180.  The Policy affords coverage to Plaintiffs for the actual presence of communicable disease at Plaintiffs' insured locations. This coverage is found under two sections of the Policy titled "Communicable Disease Response" and "Interruption by Communicable Disease" (together, the "On-Site Sublimited Communicable Disease Coverages").

181.  The Communicable Disease Response provision expressly provides that it is an "Additional Coverage."

182.  The Interruption by Communicable Disease provision expressly provides that it is a coverage "Extension."

46

183. The On-Site Communicable Disease Coverages were added to the Policy as "enhancements" to what the base policy form already covered as communicable disease.

184. Communicable Disease is a risk of physical loss or damage not excluded under the Policy.

185. The Policy contains no provision or wording that designates the On-Site Communicable Disease Coverages as the exclusive coverages applicable to physical loss or damage caused by communicable disease.

186. The On-Site Communicable Disease Coverages do not operate to limit any other coverage under the Policy that may also apply to loss or damage resulting from or caused by communicable disease, including physical loss or damage resulting from or caused by communicable disease at or away from Plaintiffs' insured locations.

187. Likewise, any sublimit applicable to the On-Site Communicable Disease Coverages does not apply to limit any other coverage under the Policy that may also apply to loss or damage resulting from or caused by communicable disease, including physical loss or damage resulting from or caused by communicable disease at or away from Plaintiffs' insured locations.

188. Rather, coverage for covered physical loss and damage, and/or resulting business interruption loss, from or caused by communicable disease at or away from Plaintiffs' insured locations, is subject to the Policy limits associated with the coverage or coverages implicated.

## CLASS ACTION ALLEGATIONS

189. Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4), Plaintiffs bring this action on behalf of themselves and all other similarly situated institutions of higher education, and seek to represent the following classes:

a. **Nationwide Declaratory Judgment Class.** All institutions of higher education that were covered as of March 2020 by the standard FM Global Advantage policy form or any other substantially similar policy form (to be identified in discovery).

b. **Nationwide Breach / Anticipatory Breach Class.** All institutions of higher education that were covered as of March 2020 by the standard FM Global Advantage policy form or any other substantially similar policy form (to be identified in discovery).

c. **College and University Risk Management Association (CURMA) Subclass.** All members of the College and University Risk Management Association (CURMA) that were covered as of March 2020 by the standard FM Global Advantage policy form or any other substantially similar policy form (to be identified in discovery).

d. **Missouri Subclass.** All institutions of higher education in Missouri that were covered as of March 2020 by the standard FM Global Advantage policy form or any other substantially similar policy form (to be identified in discovery).

190.     The numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23 are satisfied in this case.

191.     **Numerosity.** The Coronavirus and the COVID-19 pandemic have similarly impacted thousands of higher education institutions across the country and FM Global is a leading nationwide insurer of such institutions under the same or substantially similar policy form. Consequently, the Classes are comprised of hundreds and perhaps thousands of similarly situated higher education institutions, and thus the numerosity standard is satisfied. Moreover, because

48

class members are geographically dispersed, joinder of all class members in a single action is impracticable. Class members may be informed of the pendency of this class action through direct mail or other means based on FM Global's records of its policyholders.

192. **Commonality.** There are questions of fact and law common to the Classes that predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from FM Global's actions include, without limitation, the following common and predominating questions:

    a. Can the actual presence of the SARS-CoV-2 virus or COVID-19 disease cause physical loss or damage to property within the meaning of the policy at issue?

    b. Can the imminent threat posed by the presence of the SARS-CoV-2 virus or COVID-19 disease cause physical loss or damage to property within the meaning of the policy at issue?

    c. Does the threat of physical exposure of property to the SARS-CoV-2 virus or COVID-19 disease render such property unreasonably dangerous and/or unfit for its ordinary intended purpose, thereby constituting physical loss or damage to property within the meaning of the policy at issue?

    d. Does the actual or suspected exposure of property to the SARS-CoV-2 virus or COVID-19 disease constitute physical loss or damage to property within the meaning of the policy at issue?

    e. Does the SARS-CoV-2 virus bond with, and become part of, the property that it comes in contact with, thereby adversely altering the physical object, as well as the building in which that object is located, by transforming the property from safe for occupancy and commercial activity to property that is, in whole or in part, uninhabitable, unfit for its intended purpose, dangerous, and, indeed, potentially deadly?

    f. Does the "Contamination" exclusion in the policy at issue apply and preclude coverage in whole or in part as to a claim for losses and damage attributable to the SARS-CoV-2 virus and COVID-19 disease?

    g. Does the On-Site Communicable Disease Sublimit apply to limit recovery available under other coverages triggered in the policy at issue?

49

h. Whether and under what circumstances each of the Property Damage and Time Element coverages in the policy at issue is triggered by a claim for losses and damage attributable to the SARS-CoV-2 virus and COVID-19 disease.

i. In addition to or as an alternative to other evidence, given the WHO's declaration of a pandemic on March 11, 2020 and other available data and evidence about the presence of the Coronavirus and its community transmission, does a presumption exist that the COVID-19 disease and its causative Coronavirus was present or imminently present everywhere as of that time?

193. **Predominance.** The questions set forth above predominate over any questions affecting only a particular individual, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein. Specifically, hundreds if not thousands of institutions of higher education are similarly impacted by FM Global's failure and refusal to acknowledge coverage under the policies at issue for claims arising from the SARS-CoV-2 virus and COVID-19 disease.

194. **Typicality.** Plaintiff's claims are typical of those of the Classes as Plaintiffs were subject to the same or similar policy provisions and the losses and damage for all class members arise from claims under the same legal theories based on a common factual predicate associated with the SARS-CoV-2 virus and COVID-19 disease.

195. **Superiority.** A class action is the appropriate method for the fair and efficient adjudication of this controversy. FM Global has acted or refused to act on grounds generally applicable to the Classes. The presentation of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for FM Global, and/or substantially impair or impede the ability of Class members to protect their interests.

50

196. **Adequacy**. Plaintiffs are adequate representatives of the Classes because they are a member of the Classes and their interests do not conflict with the interests of those they seek to represent. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel, who have extensive experience prosecuting complex class litigation.

197. **Declaratory Relief and certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure**. On information and belief, FM Global has refused, or intends to refuse, to acknowledge coverage on claims of similarly situated class members under the same or substantially similar policies. Accordingly, final injunctive and/or declaratory relief mandating that FM Global cover the common losses and damage attributable to the Coronavirus and COVID-19 disease of Class members is appropriate respecting the class as a whole.

198. **Issue Class and Modification of Class Definitions and Creation of Subclasses**. Plaintiffs reserve the right to seek certification of one or more common issues pursuant to Rule 23(c)(4). In addition, as necessary and appropriate, Plaintiffs reserve the right to modify the definitions of the class and/or create subclasses either by amendment to the complaint or by motion for class certification based on discovery and further investigation.

## COUNT I: DECLARATORY JUDGMENT
### (Individually and on behalf of Nationwide Declaratory Judgment Class, CURMA Subclass and Missouri Subclass)

199. The preceding paragraphs are incorporated by reference as if fully alleged herein.

200. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

201. The Policy constitutes a written contract under which FM Global agreed, in consideration of the premium paid, to provide coverage to Plaintiffs for Property Damage and Time Element losses.

202.    Plaintiffs submitted a claim to FM Global for physical loss or damage to property and resulting business interruption and other covered losses and damage attributable to the presence of the Coronavirus and the COVID-19 disease (which are still ongoing), asking for FM Global's confirmation as to coverage with respect to each and every potentially applicable basis for coverage under all provisions of the "All Risks" Policy, including its Property Damage and Time Element coverages.

203.    FM Global failed and refused to acknowledge coverage on Plaintiffs' claims under the Policy, stating categorically that any claim for loss or damage attributable to the Coronavirus or COVID-19 pandemic does not constitute "insured physical loss or damage to property" and "is not of the type insured against as a virus falls within the definition of contamination, which is excluded." And even with respect to the Policy's communicable disease response and interruption coverages, FM Global took an overly restrictive and exceedingly narrow view of the Policy's vague, ambiguous and undefined trigger for those coverages in such a manner so as to evade coverage, contravene public policy, and frustrate the objectively reasonable expectations of coverage under the circumstances.

204.    Upon information and belief, FM Global is taking (or will take) the same position with other similarly situated institutions of higher education asserting a claim for coverage as to losses and damage attributable to the Coronavirus and the COVID-19 pandemic. Plaintiffs disagree with FM Global's coverage position and allege that the Policy's "All Risks" coverage, including its Property Damage and Time Element coverages, have been (and continue to be) triggered by Plaintiff's physical loss or damage to property, and that no enforceable exclusion applies to Plaintiffs' claims.

205. Thus, an actual controversy has arisen and now exists between Plaintiffs, individually and on behalf of a class of similarly situated institutions of higher education, on the one hand, and FM Global, on the other hand, concerning the respective rights and duties of the parties under the Policy and whether the Policy provides coverage for Plaintiffs' claims attributable to the Coronavirus / COVID-19 and the ongoing pandemic.

206. The Court has the authority to issue a declaratory judgment concerning the respective rights and obligations of the parties under the Policy.

207. Plaintiffs, individually and on behalf of a class of similarly situated institutions of higher education, seeks a declaration as to the scope and breadth of the parties' rights and obligations under the Policy in connection with Plaintiff's ongoing Coronavirus and COVID-19 related losses and FM Global's failure and refusal to acknowledge coverage.

208. Plaintiffs, individually and on behalf of a class of similarly situated institutions of higher education, seek a declaratory judgment declaring that the Policy's "All Risks" coverage, including its Property Damage and Time Element coverages, are triggered by Plaintiffs' claims, that no enforceable exclusion applies, and that FM Global is responsible for fully and timely paying Plaintiffs' claims, and all claims of similarly situated institutions of higher education, attributable to the Coronavirus / COVID-19 and the ongoing pandemic.

## COUNT II: BREACH OF CONTRACT AND/OR ANTICIPATORY BREACH
### (Individually and on behalf of Nationwide Breach Class, CURMA Subclass and Missouri Subclass)

209. The preceding paragraphs are incorporated by reference as if fully alleged herein.

210. Plaintiffs and other similarly situated institutions of higher education paid substantial premiums for their policies and FM Global's promises of coverage contained therein,

53

and otherwise performed all of their obligations owed under their policies or were excused from performance.

211.   The policies are valid and enforceable contracts between the parties. All conditions precedent under the policies have been satisfied or excused, or FM Global has waived or is estopped from enforcing all conditions precedent under the policies at issue.

212.   FM Global has failed and refused to acknowledge coverage, pay or otherwise honor its promises with respect to Plaintiffs' and other similarly situated institutions of higher education's claims under the policies for coverage of losses and damage attributable to the Coronavirus / COVID-19 and the ongoing pandemic. In doing so, FM Global has breached (or intends to breach – as such an anticipatory breach) its contract (including the Policy's express terms and its implied covenant of good faith and fair dealing) with Plaintiffs and other similarly situated institutions of higher education. As a result, Plaintiffs and other similarly situated institutions of higher education have suffered and continue to suffer damage in an amount to be proven at trial, but currently estimated to far exceed the jurisdictional required amount in controversy (in excess of $75,000 as to Plaintiffs; and in excess of $5 million as to the class, exclusive of interest and costs).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated institutions of higher education, request relief and judgment against FM Global as follows:

a.   That the Court enter an order certifying the class, appointing Plaintiffs as representatives of the class, appointing Plaintiffs' counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

b.   For a judgment against FM Global for the causes of action alleged against it;

54

c.      For compensatory damages and all other damages of any nature to which Plaintiffs may be entitled under contract, in equity or at law, in an amount to be proven at trial;

d.      For a declaration, as applicable to Plaintiffs individually and on behalf of all similarly situated institutions of higher education, of the parties' respective rights and obligations, including without limitation a declaration with respect to Plaintiffs' right to coverage on their claims for losses and damage attributable to the Coronavirus / COVID-19 and ongoing pandemic under the various sections of the Policy, as well as the non-applicability of any exclusion or other defense FM Global may seek to assert;

e.      For pre-judgment and post-judgment interest at the maximum rate permitted by law;

f.      For Plaintiffs' attorney's fees;

g.      For Plaintiffs' costs incurred; and

h.      For such other relief in law or equity as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Date: March 11, 2021                    Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

/s/ Todd M. McGuire
Patrick J. Stueve, MO #37682
Todd M. McGuire, MO #51361
Bradley T. Wilders, MO # 78301
Curtis Shank, MO #66221
Abby E. McClellan, MO #66069
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:      816-714-7100
Facsimile:      816-714-7101
Email:          stueve@stuevesiegel.com
Email:          mcguire@stuevesiegel.com
Email:          wilders@stuevesiegel.com
Email:          shank@stuevesiegel.com
Email:          mcclellan@stuevesiegel.com


**MILLER SCHIRGER LLC**
John J. Schirger, MO #60583
Matthew W. Lytle, MO #59145
Joseph M. Feierabend, MO #62563
4520 Main Street, Suite 1570
Kansas City, Missouri 64111
Telephone:      816-561-6500
Facsimile:      816-561-6501
Email:          jschirger@millerschirger.com
Email:          mlytle@millerschirger.com
Email:          jfeierabend@millerschirger.com


**LANGDON & EMISON LLC**
J. Kent Emison, MO #29721
911 Main Street
PO Box 220
Lexington, Missouri 64067
Telephone:      660-259-6175
Facsimile:      660-259-4571
Email:          kent@lelaw.com

56

**SHAFFER LOMBARDO SHURIN, P.C.**
Richard F. Lombardo, MO #29748
2001 Wyandotte Street
Kansas City, Missouri 64108
Telephone:     816-931-0500
Facsimile:      816-931-5775
Email:          rlombardo@sls-law.com

*Attorneys for Plaintiffs and the Proposed Classes*

## CERTIFICATE OF SERVICE

    I hereby certify that on   March 11, 2021    a true and correct copy of the foregoing document was filed electronically with the Court's CM/ECF system, which electronically sent notice of the foregoing document to all counsel of record.

/s/ Todd M. McGuire

Attorney for Plaintiffs

57